TAMPA SHIPBUILDING & ENGINEERING COMPANY, a Corporation, *Plaintiff in Error,* vs. CITY OF TAMPA, a Municipal Corporation, *Defendant in Error.*

136 So. 458.

Division A.

Opinion filed July 27, 1931.

*Jackson, Dupree & Cone,* for Plaintiff in Error;

*Karl E. Whitaker* and *H. Lane Coachman,* for Defendant in Error.

BUFORD, C.J.—In this case action was brought by the plaintiff in error, plaintiff in the court below, against defendant in error, defendant in the court below, to recover the amount of the taxes for the years 1924, 1925, 1926, 1927, 1928 and 1929 paid by the plaintiff to the defendant, the plaintiff basing its right of recovery upon a certain contract entered into between the plaintiff's predecessor, Ernest Kreher, and the City of Tampa on the 1st day of February, 1917, in which the party of the first part, joined by his wife, covenanted and agreed to sell and convey to the party of the second part certain parcels of land described as follows:

"(a)  A strip or parcel of land in Government lot four (4) aforesaid, shown in green on blue-print herewith submitted, and necessary to extend Grant Avenue, between blocks forty-eight (48) and forty-nine (49) of A. J. Knight's subdivision of East Tampa, as recorded in Plat Book One (1) on page seventy-nine (79) of the public records of Hillsborough County, Florida, from its western terminus to the East boundary line of the right of way of the Tampa Northern Railroad Company; a blue-print showing the right of way of the Tampa Northern Railroad Company being herewith submitted, said blue-print showing in green that portion of said street to be extended to the right of way of the Tampa Northern Railroad Company, and intended to be described herein;

(b)  A strip or parcel of land in said Government lot four (4) shown in green on blue-print submitted herewith, of sufficient width and length to extend the alley in Block forty-eight (48) of A. J. Knight's subdivision of East Tampa, as aforesaid, West to the East boundary of the right of way of the Tampa Northern

Railroad Company, shown on said blue-print herewith submitted; the land intended to be described hereby being shown in green on blue-print herewith sub-submitted;

(c) A strip or parcel of land in said Government lot four (4) of sufficient length and fifty (50) feet in width to extend Chapin Street, shown on the blue-print herewith submitted as being located between blocks forty-five (45) and forty-eight (48) of A. J. Knight's subdivision of East Tampa, aforesaid, from its present Western terminus West to the East boundary line of the right of way of the Tampa Northern Railroad Company; the land intended to be hereby described being shown in green on blue-print herewith submitted;

(d) A strip or parcel of land of sufficient width and length to extend the alley shown in block forty-five (45) of A. J. Knight's Subdivision of East Tampa, as aforesaid, on the blue-print herewith submitted, to the East boundary line of the right of way of the Tampa Northern Railroad Company, shown on said blue-print; the land intended to be hereby described being shown in green on blue-print herewith submitted;

(e) A strip of land fifty (50) feet wide extending from the West boundary line of the right of way of the Tampa Northern Railroad Company, shown on blue-print herewith submitted, West to the present harbor line now established by the United States Government and shown on the blue-print herewith submitted, so as to continue and extend Flagler Street from the West boundary line of said Tampa Northern right of way to the present harbor line of the United States Government, now established, a distance of approximately ........ feet;"

which agreement was on the following conditions:

"PROVIDED, HOWEVER, that in case the United States Government shall change the present harbor line to a point West of the present harbor line, in accordance with a plan prepared by the parties of the first part, application for which change is now pending with the Departments of Engineers of the United

States Government, the said strip of land hereby described shall be extended and projected West from the present harbor line to the bulkhead line of the proposed basin shown on blue-print herewith submitted; PROVIDED, HOWEVER, that in case of such extension the parties of the first part hereby reserve unto themselves, and this instrument is made upon condition that they shall have the right to dredge and deepen the land west of and abutting the said fifty (50) foot strip if extended so that the same may be used in connection with the proposed basin of the parties of the first part in connection with their proposed shipbuilding plant; PROVIDED, HOWEVER, that all riparian right in connection with said fifty (50) foot strip shall be conveyed to the City of Tampa; the land intended to be hereby described being shown in green and extended in white on the blue-print herewith submitted.''

The consideration provided in the contract was as follows:

''The party of the second part covenants and agrees to purchase the aforesaid land for the uses and purposes of public streets and alleys and to pay therefor in annual installments on the first day of October of each and every year, for a period of fifteen (15) years, a sum of money each year equal to the entire amount of municipal taxes levied upon the following described land and improvements, now situate thereon or hereafter to be located thereon, for the years in which such payment is made, situate in Hillsborough County, Florida, to-wit:

Beginning at the southeast corner of lot seven (7) block forty-three and one-half (43½) of A. J. Knight's subdivision of East Tampa, as recorded in the records of Hillsborough County in Plat Book No. 1, page 79; thence North forty-nine (49) feet to the northeast corner of said lot seven (7); thence west one hundred and fifty (150) feet to the northwest corner of lot nine (9) in said block forty-three and one-half (43½); thence North across the intervening streets and alleys and along the west boundary of block forty-four (44) and the south half of block

forty-five (45), 407.5 feet to the center of an alley running through said block forty-five (45); thence east fifty (50) feet, thence north along the west boundary of the north half of block forty-five (45); and the south half of block forty-eight (48), 255 feet to the center of an alley running through said block forty-eight (48); thence East fifty (50) feet; thence north along the west boundary of the north half of said block forty-eight (48) and the same prolonged to the center of the former roadbed of the Tampa & Palmetto Beach Railroad, now abandoned; thence northwesterly along the center of said road-bed to the north boundary of said Government lot four (4); thence west along said lot line to the north-west corner of said lot four (4); thence southeasterly along the several meander lines forming the west boundary of said lot four (4) to the southwest corner thereof; thence east along the south boundary of lot four (4) to the point of beginning, containing about 14.8 acres, together with all riparian rights incident and appurtenant thereto, but excepting from the above the following strip or parcel of land; beginning on the south boundary of said Government lot four (4), seventy-five (75) feet west measured at right angles from the center of Tampa Northern Railroad Track as constructed and operated across this property; thence north two degrees thirty minutes west parallel to said track 456.5 feet; thence east 25 feet; thence north two degrees thirty minutes west parallel to said track to the center of the former roadbed of the Tampa & Palmetto Beach Railway; thence southeasterly along the center of said roadbed to a point measured at right angles fifty (50) feet east of the center of the said Tampa Northern Railroad track; thence south two degrees thirty minutes east parallel to said track center to the center of an alley running through block forty-five (45) of A. J. Knight's Subdivision of East Tampa; thence west about 18.7 feet; thence South across the intervening streets and alleys and along the west boundary of the south half of block 45 and all of block 44 to the north boundary of block 43½; thence east to a point 50 feet measured at right

angles from the center of the Tampa Northern Railroad track; thence south two degrees thirty minutes east 49 feet to the south boundary of said Government lot four (4); thence west to the place of beginning.''

And also,

''Beginning at a point where the western boundary line of the right of way of the Tampa & Palmetto Beach Railway intersects the line dividing Government Lot three and Government Lot four of section nineteen (19) Township Twenty-nine (29) South, of range nineteen (19) east, and running thence along said western boundary line of said Tampa & Palmetto Beach Railway northwesterly to a point where a line drawn through the center of an alley between lots three and two, and lots twenty-one, twenty-two and twenty-three of block fifty-three of A. J. Knight's Sub-division of East Tampa, recorded in Plat Book One, page seventy-nine, public records of Hillsborough County, Florida, if projected due west, would intersect said western boundary line of said Tampa & Palmetto Beach Railway, thence due west to Sparkman Bay, thence beginning again at the said point herein first mentioned, to-wit: the intersection of the line between Government Lot three and Government Lot four aforesaid and the said western boundary of the said Tampa & Palmetto Beach Railway, and run thence due west along said Government line to the waters of Sparkman Bay, thence along the meander of said Bay to the northern line of said tract of land hereby intended to be described, and hereinabove described.''

It was further provided in that contract:

''The first payment hereunder shall be made for the fiscal year of 1918, and all payments shall be made on the first day of October of each and every year, for a period of fifteen years, as aforesaid.

It is agreed, however, that the party of the second part may, if it so elects, on the first day of October of each and every year, aforesaid, issue warrants or certificates for the installment due, which shall be receivable only in settlement of the municipal taxes of the

City of Tampa, for the year for which issued; and if such warrant or certificate is issued, it shall be made payable to Ernest Kreher, or his heirs, personal representatives or assigns.

It is further covenanted and agreed that this agreement shall be null and void unless the parties of the first part shall begin construction of their shipbuilding plant within six (6) months, and have said shipyard in operation within two (2) years, from the time this contract becomes effective; and it is further agreed that, if shipbuilding operations shall be suspended by the parties of the first part at any time during the term of this agreement, for a period of two (2) years, it shall be optional with the City of Tampa, by its City Council, to cease making payments hereunder; PROVIDED, HOWEVER, that this provision shall not apply in case the United States Government shall take charge or control of said shipbuilding plant, or in case same shall be taken or used by the public enemy.

The parties of the first part covenant and agree to convey unto the party of the second part, by a good and sufficient warranty deed, free from encumbrances, the land hereinabove agreed to be conveyed to it, said land to be used by the party of the second part for the purposes and uses of public streets and alleys.''

The contract was by apt words made a part of the declaration. The contract was executed in pursuance to Ordinance No. 754 which specifically authorized, directed and empowered the Mayor, City Clerk and City Auditor, on the part of and in the name of the City of Tampa to make and execute such contract.

There was a demurrer to an amended declaration which was sustained and thereupon judgment entered in favor of the defendant. To this judgment writ of error was taken.

The only question to be determined by this Court is whether or not the contract which constitutes the basis of the cause of action was a valid and enforceable contract.

The declaration alleges, in addition to what has heretofore been said:

"Plaintiff further alleges that all rights and obligations inuring to the said Ernest Kreher and his wife, Jessie Kreher, under the above mentioned contract, have been assigned to this plaintiff and that the plaintiff is the owner of the five certain parcels of land which the defendant agreed to purchase in and by its said contract, and is ready, able and willing to carry out fully the terms of said contract on its part to be performed."

It, therefore, appears from the declaration that the strips or parcels of land agreed by Kreher and his wife to be conveyed to the City of Tampa for streets and alleys were never conveyed to the City of Tampa and never appropriated by it for streets and alleys; but remained the property of Kreher until he conveyed it, with other lands, to the plaintiff.

The declaration shows clearly upon its face that the real purpose and effect of the contract was to remit the municipal taxes on the property described in the declaration and in the contract for a period of fifteen (15) years from the date thereof.

Contracts made by municipalities with persons, firms or corporations to furnish the municipality with gas or water or electrical current, either or all, in consideration of the taxes assessable against the property of the person firm or corporation used in the operation of furnishing such commodity being remitted annually during the continuation of the furnishing of such commodity have been generally sustained and held valid upon the theory that such compensation, that is the remission of taxes, was a fair and equitable return for the continued and continuous service rendered to the municipality. One of the earlier cases, and which has been often quoted and cited in support of this doctrine, is that of Cartersville Improvement, Gas & Water Co. vs. Mayor, etc. of the City of Cartersville, decided by the Supreme Court of Georgia, August 1st, 1892, reported in 16 S. E. 25. To like effect is Maine Water Co. vs. City of Waterville, 45 Atl. 830, 83 Me. 586.

Indeed, such contracts have been generally held to be binding and valid, but, in this case, we are not dealing with that class of contracts. In this case we are dealing with a contract under which the City of Tampa got nothing, as is shown by the allegations of the declaration. Courts will take judicial knowledge of the fact that under the Constitution and law of this State a municipality may condemn for streets and alleys such property as is required by the exigency of public necessity and convenience. We also recognize the rule as stated in 44 C. J. 143.

"In an action against a city on a contract which on its face is valid and within the scope of the general powers of the city, the declaration need not allege that the city had power to make the contract; nor need it negative the violation by the contractor of statutory restrictions or prohibitions relating to matters of affirmative defense."

And, further:

"Under the general rule the city must plead affirmative defenses if it wishes to avail itself of them, as, for example, the defense of ultra vires, and if the statute the violation of which constitutes an affirmative defense, contains an exception from its operation, defendant in pleading the violation of the statute must negative the existence of conditions provided for in the exception."

This rule, however, was not to be invoked in the instant case because the plaintiff included in his declaration allegations which showed affirmatively that the contract relied upon was ultra vires and, therefore, void. Therefore, its declaration showed upon its face that there was no cause of action and, was, therefore, required to fall on demurrer.

We must recognize first that this transaction occurred prior to the amendment of Article IX by the addition of section 12 thereof, which was adopted at the general election of 1930. Sections 1 and 5 of Article IX of our Con-

stitution precluded either the Legislature or the City Charter of any municipality from passing a valid Act or Ordinance containing the provisions which are apparent in the ordinance here under consideration. See Hayes vs. Walker, 54 Fla. 163, 44 Sou. 747.

In the City of Tampa vs. Kaunitz, 39 Fla. 683, 23 Sou. 416, 63 Am. St. Rep. 202, this Court in an opinion by Mr. Justice Carter said:

"Did the City of Tampa have power by contract or otherwise to exempt from taxation the properties of the South Florida Division of the Savannah, Florida & Western Railway Co., and the Tampa Water Works Co., and to perpetually bind itself to accept from the Tampa Bay Hotel Co. $200.00 per annum in full for all city taxes, without regard to the value of its property or the rate of taxation levied thereon? The plaintiff in error cites us to no authorities on this point. He plants himself upon the proposition that the exemptions were granted for a consideration, and that consequently they amounted to a contract with the city. But where does the City derive its authority to make such a contract? We have not been cited to any statute of this State authorizing the city to exempt this species of property from taxation, nor to make a contract so to do, without valid legislative authority, no city or town has power to bind itself by contract, either to forbear to impose taxes on particular property, or to impose them only under given limitations, or on certain given conditions. Black on Tax Titles, sec. 63; Cooley on Taxation p. 200; 1 Blackwell on Tax Titles, secs. 110, 117."

That the purpose of the contract here under consideration was not primarily to acquire streets and alleys which could have been otherwise lawfully acquired by the City of Tampa, but was to subsidize a shipbuilding plant in the City of Tampa is shown by that clause of the contract made a part of the declaration, as follows:

"It is further covenanted and agreed that this agreement shall be null and void unless the parties of the first part shall begin construction of their shipbuilding

plant within six (6) months, and have said shipyard in operation within two (2) years from the time this contract becomes effective; and it is further agreed that if shipbuilding operations shall be suspended by the parties of the first part at any time during the term of this agreement, for a period of two (2) years, it shall be optional with the City of Tampa, by its City Counsel, to cease making payments hereunder; PROVIDED, HOWEVER, that this provision shall not apply in case the United States Government shall take charge or control of said shipbuilding plant, or in case same shall be taken or used by the public enemy.''

The great weight of authority appears to be that municipal contracts providing for exemption from taxation or for the remission of taxes levied without legislative authority, even where there are no Constitutional limitations, are ultra vires and void. In this State at the time this contract was made there was not only a lack of legislative authority but there existed the Constitutional inhibition which precluded the legislature from granting such authority.

In the case of City of Richmond vs. Virginia Rwy. & Power Co., reported 98 S. E. 691, the Court had under consideration the validity of a clause in a contract executed by the railroad company on the one hand and the municipality of what was then the City of Manchester on the other hand, which clause was as follows:

"That a part of the consideration for the purchase by the party of the second part of said property is that the City of Manchester is to and does hereby exempt said property forever from taxation by its authorities, either direct or indirect, general or special, and also all improvements or other property now thereon or which may hereafter be added thereto.''

The Virginia Rwy. & Power Co. claimed exemption under this clause in a conveyance of the property involved. In the opinion which was written by Mr. Justice Sims, the Court said:

"The cases relied on by the Virginia Railway &

Power Company to support an affirmative decision of the question just stated, or which are cited in the brief for such company on the point urged, viz: that tax exemptions are valid which are supported by a valuable consideration, are the following: City of New Orleans vs. New Orleans Water Works Co. (1884) 36 La. Ann. 432; C. Conery vs. New Orleans Waterworks Co., 41 La. Ann. 910, 7 South. 9; s. c. 142 U. S. 79, 12 Sup. Ct. 142, 35 L. ed. 943; City of Frankfort vs. Capital, etc. Co. (Ky. 1895) 29 S. W. 855; Bartholomew v. City of Austin, Texas, (1898) 85 Fed. 359, 29 C. C. A. 568; Montclair Water Co. vs. Town of Montclair (1911) 81 N. J. Law, 573, 79 Atl. 258; Grant v. City of Davenport (1873) 36 Iowa, 396; Maine Water Co. v. City of Waterville (1900) 93 Me. 586, 45 Atl. 830, 49 L. R. A. 294; Phillips v. City of Portsmouth (1913) 115 Va. 180, 78 S. E. 651.

The whole extent to which the holdings of those cases go, on the question under consideration, is this: That where a continuing service is to be rendered to a municipality for which it has the power to contract, and it does make a contract for such service which is reasonable and valid in other respects, and therein, either expressly or substantially agrees to pay each year for such service the amount of the city taxes on certain property, and the amount so agreed upon appears to be only a fair return, or but a reasonably adequate consideration for the service rendered, the courts will hold such an agreement not to be in truth, a tax exemption, but an agreement to make compensation for such service, and that hence such an agreement is enforceable, either by action to recover for the service rendered at the contract price therefor, which is the annual tax, or by set-off of the value of such service against the annual tax as it accrues, so long as such service continues under such contract.''

\* \* \* \* \* \* \* \* \* \* \* \*
\* \* \* \* \* \*

''No authority has been cited before us extending the doctrine of the cases next above discussed to the point of holding that a municipality may, for any other valuable consideration than services to it such as afore-

said, contract away its taxing power, and that such contract will be held not to be a tax exemption. And, on principle it will be at once perceived that such a broad power of contract would annull all Constitutional provisions against exemption of property from taxation. It is not a question of the presence or absence of a valuable consideration to support tax exemptions against which such constitutional provisions are directed. There has seldom, if ever, arisen a case of tax exemption where such a consideration was not supposed by the taxing authority to exist at the time, and a supposedly sufficient consideration. But the evil of allowing such a power to exist, even in the Legislature, is so manifest that the rules of construction applicable to every alleged tax relinquishment, above adverted to, and the constitutional inhibition which are now in force in Virginia against the exercise of such a power, have been adopted, and have their foundation deep-seated in principles which are immutable under our form of government.''

That a contract is void, the purpose of which is either to exempt property from taxation or to remit taxes to the owner thereof for the benefit of such owner and at the expense of the taxpayers at large, is supported by Cooley on Taxation, Vol. 1, 3rd Ed. 344, 345; Mayor, etc. of Jersey City vs. New Jersey Street Rwy. Co., 73 Atl. 609; Turner vs. City of Seattle, 126 Pac. 426; Pittsburgh C. C. & S. T. Ry. Co. vs. Oglesby, et al., 76 N. E. 165; Leggett vs. City of Detroit, 100 N. W. 566; Vrana, et al., vs. City of St. Louis, 64 S. W. 180; Adams vs. Lambfish Lbr. Co., 61 Sou. 6.

In the case of Leggett vs. City of Detroit, supra, it was said:

"We have held that the right of eminent domain cannot be bartered away, and that contracts to do so by the Legislature or any agencies of the State are ineffectual and void, as being against public policy. It was so held in reopening of First Street, 66 Mich. 42, 33 N. W. 15, where a city had promised a railroad company immunity from the opening of streets across

its property. The case was discussed in Woodmere Cemetery vs. Roulo, 104 Mich. 600, 62 N. W. 1010; Wabash R. Co. v. Defiance, 167 U. S. 102, 17 Sup. Ct. 748; 42 L. ed. 87. We consider that proposition elementary and do not cite other authorities. In the present case the city has not agreed that it will not take any of this particular property by virtue of the power of eminent domain. It has, however, accepted a deed upon condition that should it do so it will omit this property from assessment districts and will relieve it from contribution to the expense thereof. In the opening of streets a city acts as an agency of government. In that respect the case differs from the case of Coit v. Grand Rapids, 115 Mich. 502, 73 N. W. 811, where, as already said, it was providing for a sewer, which is a matter of municipal interest, rather than of general public or state interest. In performing the functions of such agency, it has no private or municipal interest, and it has no power except such as is prescribed. It is given no authority to say that a given parcel of land shall never be taken as a highway, nor has it authority to agree that some or all lands which would be benefited by the establishment of a highway shall have immunity from contribution. The statute requires it to establish an assessment district, which must include all lands benefited. It cannot do less. If it can agree to omit one parcel, it may omit many. It cannot determine in advance the amount of benefits chargeable to one or more such parcels, for the law says that is for a jury. In this case it was necessary to take land through several blocks, paying adequate compensation. If such taking involved the removal of buildings, or the disturbing of large business interests, the damages would be correspondingly large, while the benefits thereto might be small. In such case such damages would necessarily be chargeable upon other lands in the assessment district, of which complainant's lands, consisting of many valuable lots, might form an important part. If they are exempt by reason of this alleged contract, the burden must of necessity fall with undue weight upon the remaining lands within the district. It would only be necessary to make enough such contracts to exempt the entire

assessment district, thereby depriving the council of any power to condemn land, for want of a source from which to compensate the owners of the land to be condemned."

In Vrana, et al. vs. City of St. Louis, it was said:

"The City was without power to agree to exempt the lots in Allen's Western addition either from general taxes or special assessments, because no such power is vested in it by its charter, and unless this power is granted it does not exist. This must now be regarded as settled law in this State. It was so ruled in State vs. Hannibal & St. J. R. Co., 75 Mo. 208, as to an attempted exemption by the City of Hannibal as to municipal taxes, in order to prevent a removal of the general offices and machine shops of the railroad company. The reasoning of Sherwood, C. J., in that case, leaves nothing to be added, and decides the principle involved in this case. The charter of St. Louis does not contain any such power of exemption. Beach, in his work on Public Corporations, referring to State v. Hannibal & St. J. R. Co., supra, and many other authorities, states the result to be that: 'A municipal corporation has no power to grant exemption from or a commutation of taxes, and a contract which undertakes to do is void; nor can municipalities discriminate in favor of any property. The power to exempt is not included in the power to tax, but must be specifically conferred.' "

For the reasons stated, the judgment should be affirmed and it is so ordered.

Affirmed.

ELLIS AND BROWN, J.J., concur.

WHITFIELD, P.J., AND TERRELL AND DAVIS, J.J., concur in the opinion and judgment.