182 So.2d 412 (1965)
The CITY OF NAPLES, a municipal corporation organized and existing under the laws of the State of Florida, et al., Appellants,
v.
Vincent H. CONBOY, and other taxpayers of the City of Naples, not named but made parties as members of a class, Appellees.
Vincent H. CONBOY, and other taxpayers of the City of Naples, not named but made parties as members of a class, Cross-Appellants,
v.
The CITY OF NAPLES, a municipal corporation organized and existing under the laws of the State of Florida, et al., Cross-Appellees.
No. 33707.
Supreme Court of Florida.
October 13, 1965.
Rehearing Denied December 2, 1965.
*414 David C. Spingler, Naples, for City of Naples and Bert L. Pinkston.
Smith, Carroll, Vega, Brown & Nichols, Naples, for Aqualane Shores, Inc., and Fuller Industries, Inc.
Darrey A. Davis and Hector, Faircloth & Davis, Miami, for Port Royal, Inc.
Berryhill, Avery & Law, Fort Lauderdale, for Moorings Development Co. of Canada, Ltd.
Walter R. Condon, Condon & McDaniel, Naples, for Vincent H. Conboy, and others, appellees and cross-appellants.
ROBERTS, Justice.
This is a direct appeal to review a decision of the Circuit Court of Collier County invalidating a contract and two ordinances of the City of Naples, purporting to extend certain tax benefits to the appellants. In reaching his decision the chancellor, in his decree, construed Sections 1 and 5 of Article IX of the Constitution of Florida, F.S.A., and the appellate jurisdiction is therefore vested in this court. See McNayr v. State ex rel. Dupont Plaza Center, Inc., 166 So.2d 142 (Fla. 1964); Green v. Walter, 161 So.2d 830 (Fla. 1964); State ex rel. Glynn v. McNayr, 133 So.2d 312 (Fla. 1961).
Among other things, the chancellor found (1) ordinances 400 and 615 of the City of Naples to be invalid; (2) the contracts between the municipal corporation and the appellants (developers) to be invalid and unenforceable; and (3) that the taxing authorities of the City should reassess the property owned by the appellants (developers) involved in this litigation for the years 1962 and 1963; and in effect that the contracts were ultra vires and also barred by Sections 1 and 5, Article IX of the Constitution of Florida.
In 1954 the City of Naples adopted Ordinance No. 400 which provides:
"Section 1. All developers of land lying within the City of Naples, Florida, who desire to create subdivisions from lands composed generally of mangrove swamp, overflowed and other low lands, and who desire to take advantage of this Ordinance shall first submit to the Council for its approval, the method and the approximate cost of such improvements.
"Section 2. The Council shall then determine from such plans whether such development as proposed will benefit the City from the standpoint of health or safety or general welfare and should it so decide that such development is in the public interest, shall do the following provided that other ordinances and laws relating to plats and subdivisions are complied with: (a) Make a specific finding that the proposed development is in the public interest from the standpoint of health, safety or general welfare. (b) Agree to assess all lots in the subdivision, unimproved by physical buildings, to which title remains in the developer, whether it be a person, firm or corporation, as acreage until such time as sixty per cent of the lots have been sold, or the period of ten years has elapsed whichever shall occur first. (c) Enter into a binding contract with the developer guaranteeing the above for the term stated.
"Section 3. This ordinance is hereby declared to be in the public interest and designed to promote the health, safety and general welfare of Naples, Florida."
In 1957 certain amendments were made but the amendments are immaterial to the issues here involved.
For many years the City and various developers acted without objection under contracts similar or comparable to the following:
"It is hereby mutually agreed between the parties hereto that for the *415 next 10 years, or until 60% of the lots shall be sold by Port Royal, Incorporated, whichever is sooner, all lots in the proposed subdivision shall be assessed for City tax purposes as acreage only and at valuations comparable to valuations assessed against other unimproved, submerged lands within the City limits; provided that in the event Port Royal, Incorporated, shall place buildings upon any of said lots while still assessed to it then and in that event the particular lot shall be treated and assessed as though sold."
The principal question in the taxpayers' class suit is whether a municipality has authority to make such contracts. The lower court, in a well-reasoned opinion, held that it did not and cited as authority Tampa Shipbuilding and Engineering Co. v. City of Tampa, 102 Fla. 549, 136 So. 458 (1931), and City of Tampa v. Kaunitz, 39 Fla. 683, 23 So. 416, 63 Am.St.Rep. 202 (1898). The Tampa Shipbuilding case held, inter alia, that without valid legislative authority, no city or town has power to bind itself, by contract, either to forebear to impose taxes on particular property, or to impose them only under given limitations, or on certain given conditions. The purpose of the contract there was to subsidize a shipbuilding plant in the City of Tampa with its various assets to a city community and the purpose of the contract in instant case is to encourage residential improvements, thus, hopefully, increasing the size of the tax roll. We have a similar situation in the City of Tampa case, supra, where the court stated 23 So. on page 420:
"(b) Did the city of Tampa have power, by contract or otherwise, to exempt from taxation the properties of the South Florida Division of the Savannah, Florida & Western Railway Company and the Tampa Waterworks Company, and to perpetually bind itself to accept from the Tampa Bay Hotel Company $200 per annum in full for all city taxes, without regard to the value of its property, or the rate of taxation levied thereon? The plaintiff in error cites us to no authorities on this point. He plants himself upon the proposition that the exemptions were granted for a consideration, and that, consequently, they amounted to a contract with the city. But where does the city derive its authority to make such a contract? We have not been cited to any statute of this state authorizing the city to exempt this species of property from taxation, nor to make a contract so to do. Without valid legislative authority, no city or town has power to bind itself, by contract, either to forebear to impose taxes on particular property, or to impose them only under given limitations, or on certain given conditions."
In connection with the constitutional inhibitions, we have carefully considered the contention that the tax exemptions are for a valid municipal purpose, however, we find that the supposed consideration for the contracts is speculative and incidental and that the courts have held similar plans to be primarily for the benefit of a private enterprise and not primarily for the benefit of the public. City of Daytona Beach v. King, 132 Fla. 273, 181 So. 1 (1938); City of Bradentown v. State, 88 Fla. 381, 102 So. 556, 36 A.L.R. 1297 (1924). The subdivisions are owned and controlled by private persons, firms or corporations and the revenue accrues to these developers. In contrast, in Gwin v. City of Tallahassee, 132 So.2d 273 (Fla. 1961), revenue from an electrical generating plant accrued to the city which owned and operated the facilities, and the court there held that the function came within the concept of "municipal purpose" and was therefore entitled to the tax exemption. There is no question as to the good faith of the taxing authority, but the danger of allowing such power of exemption to exist is so manifest *416 that our Constitution, Article IX, § 1[1] and § 5[2] prohibits the exercise of such power.
The chancellor buttressed his decision that the contract was void as being ultra vires by also holding, in effect, that §§ 1 and 5 of Article IX, Constitution of Florida, prohibit such tax advantages flowing to individuals. The chancellor was eminently correct in holding that such discrimination in favor of the appellants would violate § 1, Article IX of the Constitution.
By cross-appeal, the complaining taxpayers, relying on a portion of F.S. § 192.21[3] and a portion of § 193.23, F.S.A.[4] contend that the City should be required to "back-assess" for 1959, 1960 and 1961, the subject lands at their fair and just valuation.
The chancellor denied the prayer that the City reassess the developers' lands under contract with the City for the three years prior to 1962, the year the action was commenced, stating in his final decree that "the taxing authorities of the municipal corporation are hereby directed to reassess the property owned by the developers and involved in this litigation for the years 1962 and 1963 and assess said properties for tax purposes as would have been done had the contracts with the defendant developers never existed." The cross-appellants argue in their brief that "[W]hen a city fails to follow the equal and just principle, and its charter fails to provide a corrective procedure, the Court should implement state law which will enforce the fundamental principle."
*417 The cross-appellees contend that the claim of cross-appellants for the three years prior taxes allowed to be backassessed under § 193.23 is barred by F.S. § 192.21, F.S.A. which provides in part: "* * * no assessment shall be held invalid unless suit be instituted within sixty days from the time the assessment shall become final * * *." They further contend that F.S. § 193.23 is inapplicable because the taxes had been levied and collected for those years and that the property did not escape taxation.
The question thus posed is whether the city may reassess at fair value property that had been undervalued for the prior three years. We conclude upon reason and authority that the city should be limited to reassessments subsequent to the commencement of this action.
The fact that the contracts with the City were declared void does not necessarily make the assessments themselves void or unlawfully assessed or levied. See City of Tampa v. Kaunitz, supra, 23 So. page 421:
"We think tax officers, like all others, are required to exercise good faith in performing their official duties. They should not use their official position or official discretion as a cover for fraudulent conduct in unequally and inequitably adjusting the burdens of taxation. For it is a salutary principle of law, which runs through all its branches, that fraud vitiates and annuls everything which it touches. If, therefore, tax officers intentionally commit an illegal act, with a fraudulent purpose in view, as where taxable property is intentionally omitted for an improper purpose, we have no doubt that the entire assessment is illegal and void. If, however, the omission to assess taxable property arises in consequence of a bona fide belief on the part of the taxing officers that the omitted property is exempt from taxation, or results from inadvertence or negligence, without any intent on their part to impose additional or unequal burdens upon other taxpayers, the assessment will not be held to be void."
Also in Dade County v. Dupont Plaza, Inc., 117 So.2d 849 (Fla.App. 3rd Dist. 1960) in a suit to avoid an assessment on grounds that it was excessive, it was held that no assessment of property taxes should be held invalid unless suit be instituted within sixty days from the time the assessment became final. In Rudisill v. City of Tampa, 151 Fla. 284, 9 So.2d 380 (1942), this court upheld the validity of the restrictive period allowed by statute [§ 192.21] stating, inter alia, "* * * The legislature is necessarily vested with power to enact necessary laws to secure a prompt collection of the annual tax. In the exercise of such powers they must not invade the constitutional rights of the property owner. Provision is made here, however, for the owner to make return of his property and value same for taxation. He has further remedy to petition the equalization board for appropriate relief. He is allowed a minimum of thirty days [prior to 1943 this section allowed 30 days] from the final act of the administrative officers to resort to the courts if he feels aggrieved by the administrative taxing authorities. While the time may appear relatively short, nevertheless it cannot be said that the time fixed by the legislature is so unreasonable as to amount to depriving him of his property without due process." Compare Nash v. Merritt Island Lumber Company, 110 So.2d 677 (Fla. App., 2nd Dist. 1959).
The tax assessor of the City of Naples merely used as a guideline a standard measure of values which has now been declared to be unfair.
Cross-appellants failed to institute suit within 60 days and the statute provides therefore that no assessment shall thereafter be held invalid.
The duty for each citizen to bear a just share of taxation, justice to other *418 taxpayers, and the requirements of orderly government make it inequitable to give relief in all instances because there may be some inequality in an assessment which, if it in fact existed, could have been remedied by pursuing remedies in time for proper assessments to be made so that all may appropriately share tax burdens to support efficient government for the protection of the property rights of all. See Hackney v. McKenney, 113 Fla. 176, 151 So. 524 (1933). We held in West Virginia Hotel Corporation v. W.C. Foster Co., 101 Fla. 1147, 132 So. 842 (1931), citing City of Tampa v. Palmer, 89 Fla. 514, 105 So. 115 (1925): "* * * if the over-valuation was the result of mere inadvertence or bona fide mistake of judgment, the remedy of the taxpayer is to go before the administrative body provided for the equalization of tax assessments, unless the valuation is so flagrantly and obviously excessive as within itself to amount to a fraud, and clearly imputes to the tax assessor an intention to arbitrarily discriminate against the complaining taxpayer."
As previously stated the good faith of the taxing authorities is not questioned. The inequalities resulting from the assessments are a result of reliance upon the ultra vires and void tax exemption contracts between the City and the developers. Only "[W]here there is an intentional, arbitrary, and systematic undervaluation by tax officials of some of the taxable property in the same class with other property, it contravenes the constitutional rights of one whose property is intentionally and arbitrarily overvalued," and further "* * * it is held that mere errors of judgment by officials will not support a claim of discrimination. There must be something more  something which in effect amounts to an intentional violation of the essential principle of practical uniformity that good faith of such officers and the validity of their actions are presumed. When assailed, the burden of proof is upon the complaining party." Camp Phosphate Co. v. Allen, 77 Fla. 341, 81 So. 503 (1919). See also Folsom v. Bank of Greenwood, 97 Fla. 426, 120 So. 317 (1929).
We construe F.S. § 192.21, F.S.A. relative to the correction of acts of omission or commission on the part of tax assessors at any time as relating to the effect of the validity of the lien of the taxes assessed. Here the validity of the lien of taxes assessed in years prior to 1963 has not been raised and the taxes have been paid.
Although back assessments are specifically authorized by F.S. § 193.23, F.S.A. equitable estoppel would prevent the City in this case where good faith is not disputed from back assessment of taxes for the years 1959, 1960 and 1961. The city has affirmatively acted in assessing taxes as agreed under the contracts with the various developers over a period of years and it is reasonable to believe that the developers have long acted in reliance thereupon. Where the taxing authority is in full possession of all pertinent facts it is better to impose the burden upon it to exercise care than to create uncertainty as to the tax status of property for prior years. Compare Coppock v. Blount, 145 So.2d 279 (Fla.App. 3d Dist. 1962); Sharrow v. City of Dania, Fla. 1955, 83 So.2d 274; City of Miami Beach v. 8701 Collins Avenue, Inc., Fla. 1955, 77 So.2d 428; and Texas Co. v. Town of Miami Springs, Fla. 1950, 44 So.2d 808.
The other questions have been examined and found to be without merit, so the judgment of the lower court is
Affirmed.
THOMAS, Acting C.J., and DREW, O'CONNELL and CALDWELL, JJ., concur.
ERVIN, J., concurs specially with opinion.
HOBSON (Ret.), J., concurs specially and agrees with ERVIN, J.
*419 ERVIN, Justice (concurring specially).
I concur in the majority opinion solely on the basis there is no appropriate enabling statute expressly authorizing the adoption of the city ordinance granting ad valorem tax benefits to the land developers. I express no opinion on the constitutionality of the municipal tax benefits involved in this case inasmuch as it is unnecessary to do so since they have not been authorized by legislative act.
I disagree with the view expressed in the foregoing opinion that Sections 1 and 5 of Article IX of the State Constitution preclude the exercise of legislative power to authorize grant of municipal tax benefits per se. On the contrary, Section 1, Article IX specifically excepts from regulations securing just valuation of all property, "such property as may be exempted by law for municipal * * * purposes" (emphasis supplied).
There are or may be conditions or needs in the life of a municipality which make it vitally necessary in order to further some municipal purpose in respect to such conditions or needs, that contractual agreements be entered into by the municipality with taxpayers or prospective taxpayers. It may be that the only consideration the city can offer or reasonably should offer to support such a contract is a tax benefit or advantage.
The following are some examples of lands privately owned whose owners might be granted tax advantages if the use to which their lands are to be partly devoted or if some change is to be made in their lands' physical nature, serves a municipal purpose, viz.: private lands reserved for municipal woodland, greenbelt, forestry, park or recreational purposes; private lands used for municipal pier lines or bulkhead fills or spoil areas; private lands used for public off-street parking or street setback purposes; private lands reserved for future industrial plants, terminals or warehouses, pursuant to city development plans; and private lands covenanted to be devoted to malls and trade marts. Also, tax benefits conceivably might be allowed landowners for their cooperation in eliminating from their land deleterious low lying muck, swamp or marsh areas within a city.
In the examples noted municipal purposes promotive of the general welfare of municipal citizens might well be served by the public use or change in the physical nature of privately owned lands, justifying tax exemptions in the form of certain agreed-upon tax benefits or advantages. Each such tax exemption or tax benefit contractually agreed upon could be judicially scrutinized in a proper case if aggrieved persons believed the enabling statute unconstitutional in some particular or if they considered the contractual agreement purportedly executed in accordance with the statute to be in any respect fraudulent or overreaching. Compare Tyson v. Lanier, Fla. 1963, 156 So.2d 833, Lanier v. Overstreet, Fla. 1965, 175 So.2d 521, and Markham v. Blount, Fla. 1965, 175 So.2d 526.
The two cases cited in the majority opinion, Tampa Shipbuilding and Engineering Co. v. City of Tampa, 102 Fla. 549, 136 So. 458 (1931), and City of Tampa v. Kaunitz, 39 Fla. 683, 23 So. 416, 63 Am.St. Rep. 202 (1898), stand only for the proposition that in the absence of a valid statute no tax benefit or advantage can be authorized by a municipality. They do not hold there is no legislative power at all because Sections 1 and 5 of Article IX of the State Constitution prohibit authorization of municipal tax benefits.
Constitutional provisions ordinarily need not be construed to prohibit particular legislation before it is enacted. Unless the Constitution in clear and unmistakable language prohibits enactment of legislation it is far better to await the legislative product and then test it according to constitutional standards. It would be time enough to determine whether a particular tax exemption in the form of a tax benefit is *420 valid when reviewed in the light of its enabling legislation and the municipal purpose it purports to serve, rather than to strike down in advance all possibility of its ever being enacted.
We should avoid straitjacketing the exercise of legislative power designed to aid the growth and progress of our local communities. If at all possible, we should accord to the Legislature the power to meet future exigencies arising in respect to particular municipalities by refraining from narrow and restrictive construction of constitutional provisions prior to the time the Legislature has had opportunity to legislate and possibly bring its legislation within those areas reserved to it which are not prohibited by the Constitution.
I would affirm this case solely on the ground there is presently no legislative authority for the municipal tax benefit, leaving the subject matter open to possible future enabling or ratifying legislation.
HOBSON (Ret.), J., concurs.
NOTES
[1] "Section 1. Uniform and equal rate of taxation; special rates.  The Legislature shall provide for a uniform and equal rate of taxation, except that it may provide for special rate or rates on intangible property, but such special rate or rates shall not exceed two mills on the dollar of the assessed valuation of such intangible property; provided, that as to any obligations secured by mortgage, deed of trust, or other lien, the Legislature may prescribe an intangible tax of not more than two (2) mills on the dollar, which shall be payable at the time such mortgage, deed of trust, or other lien is presented for recordation, said tax to be in lieu of all other intangible assessments on such obligations. The special rate or rates, or the taxes collected therefrom, may be apportioned by the Legislature, and shall be exclusive of all other State, County, District and municipal taxes; and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal, excepting such property as may be exempted by law for municipal, education, literary, scientific, religious or charitable purposes."
[2] "Section 5. Taxes for county and municipal purposes.  The Legislature shall authorize the several counties and incorporated cities or towns in the State to assess and impose taxes for county and municipal purposes, and for no other purposes, and all property shall be taxed upon the principles established for State taxation. But the cities and incorporated towns shall make their own assessments for municipal purposes upon the property within their limits. The Legislature may also provide for levying a special capitation tax, and a tax on licenses. But the capitation tax shall not exceed one dollar a year and shall be applied exclusively to common school purposes."
[3] "All taxes imposed pursuant to the constitution * * * shall continue in full force and effect until discharged by payment, and no act of omission or commission on the part of any tax assessor, * * * shall operate to defeat the payment of said taxes; but any such acts of omission or commission may be corrected at any time * * * and when so corrected they shall be construed as valid ab initio * * * all provisions of law now existing or which may be hereafter enacted relating to the assessment and collection of revenue (unless otherwise specifically so declared) shall be deemed and held to be directory only * * *." F.S. § 192.21, F.S.A. (Emphasis supplied.)
[4] "When it shall appear that any ad valorem tax might have been lawfully assessed or collected upon any property in this state but that such tax was not lawfully assessed * * * then the officers authorized shall make the assessment of taxes * * * and such assessment shall have the same force and effect as it would have had if it had been made in the year in which the property shall have escaped taxation * * *." F.S. § 193.23, F.S.A.