**INVESTORS SYNDICATE OF AMERICA, INC., Plaintiff-Appellant,**

v.

**The CITY OF INDIAN ROCKS BEACH, FLORIDA, et al., Defendants-Appellees.**

**No. 29348.**

United States Court of Appeals, Fifth Circuit.

Nov. 12, 1970.

Peter J. Winders, Tampa, Fla., for plaintiff-appellant.

Owen S. Allbritton, III, Charles F. Barber, Clearwater, Fla., R. Clark Robinson, St. Petersburg, Fla., for defendants-appellees.

Before BELL, THORNBERRY and CLARK, Circuit Judges.

CLARK, Circuit Judge:

Investors Syndicate of America, Inc. (Investors), the holder of municipal revenue bonds, sought declaratory and injunctive relief against the issuing city and the bank having depositary custody of accumulated sinking fund monies, to secure the pre-maturity redemption or purchase of a portion of said revenue bonds. On the bare bones of the complaint and the motion of the city, the trial court dismissed the entire complaint for failure to state a claim upon which relief could be granted. We reverse.

By adoption of its Ordinance No. 73, the City of Indian Rocks Beach, Florida (City) formalized its determination to construct and maintain a municipal sewage collection system to be funded by special assessments and certain increases in excise taxes. In order to obtain the

immediate funds necessary to construct the system, the ordinance authorized the issuance of 950,000 dollars worth of sewer revenue certificates (bonds) in denominations of 1,000 dollars each— 200,000 dollars in face value of such bonds, numbered 1–200, bore a final maturity date in 1984 and all of the remaining bonds, numbered 201–950, with a total face value of 750,000 dollars, bore a final maturity date of January 1, 1989. As required by the ordinance, the City entered into a Trust Agreement with the Union Trust National Bank of St. Petersburg, Florida (Bank) under the terms of which the Bank became the trustee of monies required to be collected and retained by the City for bond holders.

The complaint filed by Investors contained three counts. Count I was based upon the contractual terms of the bond and Ordinance No. 73. Count II asserted breach of trust. Count III alleged estoppel. A copy of Ordinance No. 73 with all amendments, a sample sewer revenue bond, the Trust Agreement between the City and the depositary bank, the Official Statement covering the offer of these bonds and a letter from the City's bond-approving attorneys were made exhibits to the complaint.

The complaint averred the facts to be these. On June 30, 1969, the Sinking Fund established in accordance with Ordinance No. 73 contained more than 540,000 dollars over and above the amounts in the Reserve Fund and the Renewal and Replacement Fund. This sinking fund balance had resulted from pre-payments of assessments by the City's property owners. Investors is, and has been since the Trust Agreement between the City and the Bank was established, the owner and holder in due course of all certificates numbered 201–950, being all certificates bearing a final maturity date of January 1, 1989 which were issued under the terms of said Ordinance No. 73. The funds presently held by the Bank are sufficient to retire a substantial portion of Investors' certificates without in any way impairing the security of the remaining outstanding certificates. The City contends that it is vested with discretion to keep and maintain all sinking funds and to make permitted investments with said funds, which would ultimately inure to the profit of the City, until the final maturity date of 1989 specified in the bonds. Investors has demanded that the City and the Bank apply the surplus funds now in the sinking fund to the retirement of the bonds it holds, but the City and the Bank have refused to either redeem or purchase any part of those bonds. In connection with the offer to sell these bonds, the City published a prospectus entitled Official Statement which it distributed to prospective purchasers during January of 1965 prior to the sale of any of the bonds. This statement represented to all prospective investors that a portion of the bonds with maturity dates in 1989 would be redeemed or purchased beginning January 1, 1969 out of funds predicted to be available in the Sinking Fund. By a letter dated February 25, 1965, the firm of attorneys who had been employed as bond-approving attorneys by the City expressed the written opinion that if surplus monies were to become available in the Sinking Fund, they "must be used annually to redeem the certificates once the call date (January 1, 1969) has become applicable." The representations in the Official Statement and in the opinion letter of the City's bond-approving attorneys were furnished by the City to Investors with the intent that it rely thereon, and Investors did rely thereon in purchasing 750,000 dollars worth of these revenue bonds.

Ordinance No. 73 of the City contained the following pertinent provisions.

"SECTION 3. In consideration of the acceptance of the Certificates authorized to be issued hereunder by those who shall hold the same from time to time, this Ordinance shall be deemed to be and shall constitute a contract between the City and the Certificate Holders.

\* \* \* \* \* \*

SECTION 11. The Certificates maturing in the year 1989 shall, at the option of the City, be redeemable in whole or in part from Sinking Fund moneys only, on January 1, 1969, or on any interest payment date thereafter, at the price of par and accrued interest plus a premium equal to 3% of the par value of such Certificates.

The Certificates maturing in the years 1984 and 1989 shall, at the option of the City, be redeemable in whole or in part from any funds legally available for such purpose on January 1, 1974, or any interest payment date thereafter at the price of par and accrued interest plus a premium equal to 3% of the par value of such Certificates.

Such Certificates, if less than all, shall be redeemable in the inverse order of their numbers.

(This is as amended January 18, 1965.)

(*Note*: Section 12 is pertinent but is not reproduced here. It set out the exact and full text of the certificates.)

SECTION 13. Neither the Certificates nor coupons shall be or constitute general obligations or indebtedness of the City as bonds within the meaning of Section 6, Aricle IX, of the Constitution of Florida, but shall be payable solely from and secured by a lien upon and a pledge of the special funds as herein provided.

\* \* \* \* \* \*

SECTION 15. \* \* \* the City covenants with the holders of any and all of the Certificates issued pursuant to this Ordinance as follows:

A. The entire gross revenues derived from the operation of the system shall be deposited into a special fund which is hereby created and designated "Sewer System Revenue Fund" (hereinafter sometimes called the "Revenue Fund"). All moneys in the Revenue Fund shall be held in trust and applied as hereinafter provided in subsection B of this Section 15.

B. All moneys at any time on deposit in the Revenue Fund shall be disposed of only in the following manner and order of priority:

(1) The moneys shall first be used for the deposit into a fund to be known as the "Operation and Maintenance Fund" which is hereby created, of such sums as are necessary for current monthly operating expenses.

(2) All remaining moneys in the Revenue Fund after payments into Operation and Maintenance Fund will be withdrawn and deposited in a fund known as the "Sewer System Revenue Certificates Sinking Fund", (hereinafter referred to as the "Sinking Fund"), hereby created.

Moneys in the Sinking Fund shall be used first to pay maturing interest on the Certificates when due.

Moneys remaining in the Sinking Fund will next be used to pay \* \* \* the amount of $35,000.00. \* \* \*

There shall also be deposited in the Reserve Account the amount of $30,000.-00 from the proceeds of the sale of the Certificates. The aggregate amount equal to $65,000.00 shall remain on deposit \* \* \* until January 1, 1974. \* \* \* Moneys in the Reserve Account will be used to pay maturing principal and interest whenever moneys in the Sinking Fund are insufficient therefor. \* \* \*

(3) Commencing no later than 36 months after delivery of the Certificates, moneys remaining in the Sinking Fund will be withdrawn and deposited in the Renewal Replacement Fund \* \* \* in an amount equal to 1/12 of 20% of $15,000.00. \* \* \*

The moneys in the Renewal and Replacement Fund shall be used only to cover the cost of the renewal and replacement of the properties and assets of said Sewer System, or for extraordinary repairs \* \* \*

\* \* \* \* \* \*

(4) Any moneys remaining on deposit in the Sinking Fund after the payments above in subparagraph (1), (2) and (3) have been made shall be used to redeem Certificates as provided or to buy Certificates as long as the purchase price is

equal to or less than the redemption price, but only to the extent that there remain on deposit in the Sinking Fund an amount at least equal to the amount required to pay the principal and interest maturing on the outstanding Certificates for the next twelve months.

*    *    *    *    *    *

(8) * * * the Sinking Fund * * * established, maintained and created by this Ordinance shall constitute trust funds for the purpose provided herein for such funds. * * * Moneys in the Sinking Fund may be invested in direct obligations of the United States maturing not later than the next succeeding date on which the Certificates are required to be redeemed or purchased from the moneys on credit to such account but only to the extent that these moneys on credit to such account but only to the extent that these moneys exceed the next maturing 12 months interest. Any and all income received by the City from such investments shall be deposited into the Sinking Fund."

The following language from the exhibited Trust Agreement should also be noted.

Section 3. That there is annexed hereto as Exhibit "A" and incorporated herein as if fully set forth, a certified copy of said Ordinance adopted on September 19, 1963.

(a) All moneys deposited in the Sinking Fund and in the Reserve Account by the City shall be held by the Trustee in trust and applied solely to the payment of the principal of and interest on the $950,000 Sewer Revenue Certificates in accordance with the provisions of said ordinance.

*    *    *    *    *    *

Section 19. This agreement shall be deemed to have been and is made for the benefit of the holders from time to time of the Sewer Revenue Certificates and shall be enforceable by any of the holders thereof.

As mandated by Section 12 of the Ordinance, the actual bonds themselves provided:

This Certificate is one of an authorized issue of Certificates in the aggregate principal amount of $950,000 * * * under the authority of * * * Ordinance No. 73 * * * and is subject to all the terms and conditions of such Ordinance.

*    *    *    *    *    *

The Certificate of this issue maturing in 1969 may be redeemed prior to their stated date of maturity in whole or in part, from the Sinking Fund only, on January 1, 1969, or any interest payment date thereafter until maturity, at a price of par and accrued interest plus a premium of 3% of the par value of such Certificates.

The Official Statement exhibited to the complaint contained a table setting forth estimated certificate retirement, which predicted that normal anticipated revenues in the Sinking Fund should be sufficient to result in the call of bonds valued at 271,000 dollars in 1968, 63,000 dollars in 1969 and 54,000 dollars in 1970.

The Bank answered, admitting that it had executed the Trust Agreement exhibited to the complaint, admitting that it was unwilling to apply any surplus toward certificate retirement without instructions from the City or a court order, and alleging that it was without knowledge as to the general allegations of the complaint, even the allegations as to the amounts it held as trustee.

The City filed only a Motion to Dismiss which tersely stated that the bonds showed on their face that purchase or redemption by the City before the final maturity date of 1989 was not mandatory but merely permissive at the option of the City, and that the bonds themselves constituted the sole legal basis for any claim by Investors against the City. As to Count III alleging estoppel, the Motion to Dismiss asserted an additional failure to state a claim was shown in that the necessary elements creating estoppel had not been alleged with the "particularity required."

In a wholly unreasoned decree, the district court ordered:

> "That Defendant's (City's) Motion to Dismiss be and the same is hereby GRANTED, and the above styled case is dismissed."

The basic legal tenets governing appellate review of a trial court's pre-merit dismissal on the pleadings may be characterized as truisms, yet they are so critical that they warrant repetition until they become rote. The Motion to Dismiss under Fed.R.Civ.P. 12(b) (6) admits all well-pleaded facts in the complaint which it challenges, just as did its antecessor, the common law demurrer. Both a motion to dismiss and a demurrer pose this legal challenge: If every fact alleged by the opposite party be taken as established, the pleader is still entitled to no relief against me. Wright & Miller, Federal Practice and Procedure: Civil § 1355. However, consistent with today's practice favoring disposition of cases on their merits, a court must go much further than merely accepting the facts of the complaint. In the case of Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L. Ed.2d 80 (1957) the Supreme Court restated this emphatic requirement:

> " * * * in appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S.Ct. at 102

Before and after *Conley* this circuit announced its adoption of this comprehensive standard. *See e. g.,* Des Isles v. Evans, 200 F.2d 614 (5th Cir.1952) and Arthur H. Richland Co. v. Harper, 302 F.2d 324 (5th Cir.1962).

More recently this court has chosen to emphasize the desirability of resolving lawsuits on their real merits rather than upon pleading draftsmanship by updating the long list of cases where such dismissals have been reversed in Pred v. Bd. of Public Instruction, 415 F.2d 851 (5th Cir.1969); *see also* Merlite Land, Sea & Sky, Inc. v. Palm Beach Investment Properties, Inc., 426 F.2d 495 (5th Cir.1970). Our language in Inter-Continental Promotions, Inc. v. MacDonald, 367 F.2d 293 (5th Cir.1966), a Florida based diversity action involving contract construction, is even more precisely pertinent to the case at bar. There we held dismissal on the merits to be improper and stated:

> "If there is any doubt as to what the parties meant, a trial should be had, not to contradict the contract but to show what the parties meant by their contract."

We now proceed to determine the sufficiency of Count I. At the outset of this analysis we would note our disagreement with the City's contention that the face of the bond must constitute the sole legal basis for any claim by a bond holder against the City. These bonds expressly embody Ordinance No. 73 and each bond is subject to all terms and conditions of the Ordinance. In turn, the Ordinance expressly mandates every word which appears in the face of the bond. In Section 3 of the Ordinance the City chose to provide that, by acceptance of a bond, the bond holder entered into an implied agreement that the Ordinance constituted a contract between himself and the City. The fact that the bonds provide that they are negotiable instruments does not alter the rights of Investors against the City. As between the parties to this litigation, the negotiable character of the bond is simply immaterial, because no limitation on the rights of a holder in due course are involved. The City would be fully bound by the terms of its own ordinance even if negotiability were to be destroyed by incorporation of the ordinance, a matter we need not reach. Although the Uniform Commercial Code was not effective until after these bonds were issued and Florida had no comparable pre-Code statute, F.S.A. § 673.3–119(1) aptly expresses this principle.

As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument.

In the present posture of this case, it is not possible to say with full assurance that the language of the call provisions to which these bonds are subject, which is set out in Section 11 of the Ordinance and reiterated in abbreviated form in the face of the bond, may not be in conflict with the fund handling requirements imposed by Section 15(b) of the Ordinance. It is quite logical that the draftsman inserted only an abbreviated reference to the call provisions in the face of the bonds and did not attempt to detail the numerous procedures which the City was required to follow in establishing, maintaining and disbursing various funds and accounts required for bond holder protection. While the two provisions certainly should both be of interest to a bond holder, the call provisions are easily expressed in a few words while, on the other hand, any adequate explanation of the various conditions imposed by Section 15 would have required more space than was allotted to all of the fine print terms chosen for inclusion on the face of the bond.

The crux of the matter gets to be whether an ambiguity is created by stating in the call provisions that *redemption* "may" or "shall, at the option of the City" be made from the Sinking Fund only as opposed to the provisions of Section 15(b) (4), which provide that, after payment of current operating expenses and the proper funding of a reserve account for current interest and funds for repairs, all moneys remaining on deposit in the Sinking Fund "shall" be used to redeem or to purchase outstanding certificates. The only plausible construction which would allow the call

provisions of Section 11, as paraphrased in the face of the bond, to be harmonized with the provisions of Section 15, which flatly require redemption or purchase of bonds if funds be available, would be to hold that surpluses in the Sinking Fund mandate the City to *purchase* bonds on the open market whenever they can be purchased at the redemption price or below. Investors makes a persuasive argument that some construction requiring acquisition of bonds with surplus funds must be applied, otherwise the City would have engaged in issuing sewer revenue bonds in order to acquire funds for investment purposes, a practice which Investors contends is beyond the statutory authority vested in the City.

In this connection we would note two additional factors. First, the complaint establishes as a fact at this stage of the proceeding that all certificates which are subject to the Sinking Fund purchase or redemption requirements were held by Investors alone, and such certificates as Investors now holds bear the highest numbers of all certificates issued. Thus, under the clear and unambiguous requirements of both the bond and the Ordinance, these highest numbered certificates are entitled to priority of redemption or purchase over all other outstanding bonds. Second, the fact that the purchase provisions contemplated that bonds would be available on the open market at less than the premium redemption price indicates that the City contemplated the rate of interest obtainable on this type of investment might increase, thereby causing a decline in the value of such bonds.

If the City desired to hold Sinking Fund moneys for its own investment purposes against the interests of its bond holders, it should have made this intention explicitly clear to them. At least we can say, with assurance, that if this redemption-purchase differentiation is not the proper construction to be placed upon these documents, then they are ambiguous and the trial court should require a further fact development after

which it will be able to apply the pertinent rules for construction of ambiguous contracts to aid it in determining the intent of the parties. In either event, dismissal of Count I of the complaint at this preliminary stage was error.

An analysis of Count II, the breach of trust count, discloses it is equally, if not more, insulated from dismissal on bare pleadings than Count I. In Section 15(8) of its Ordinance, the City provided that the Sinking Fund should constitute a trust fund for the purposes provided in the Ordinance. In accordance with its own caveat, the City acted on the 5th day of March, 1965 to enter into an agreement with the Bank which created the trust and in plain words designated the bond holders as third-party beneficiaries of that agreement. The trust character of the transaction could not have been made plainer. Yet, at oral argument, counsel for the City candidly admitted that the reason we find this bondholder beneficiary, Investors, in litigation with the City, its trustee, is that the trustee claims it is entitled to use the trust fund so that it, and not its beneficiary, can receive the benefit of the higher interest earnings available in today's money market. The potential benefit to every bond holder is obvious. If the City today redeems his bond or purchases it at or below the redemption price of 103%, he would have the immediate right to reinvest and obtain the higher yields now available. The fiduciary's City's interest in retaining the funds for current investment, even though all investment proceeds must become a part of the sinking fund, is but one step less direct. If the City only has to pay interest at 4% for money it can reinvest at 6%, then the excess moneys generated by the investment of Sinking Fund proceeds both hasten the day when the entire issue of bonds can be retired so that all sewer revenues and excise levies will be available to the City for other municipal purposes, and either reduce or eliminate excise tax contributions to the Sinking Fund. In short, the question is: Who is entitled to benefit from the present use of this money—the trustee or the beneficiary?

Even if it be conceded that the City has a complete and unbridled discretion to redeem or purchase certificates or, in the alternative, to retain the funds and make investments so as to benefit itself, the City, as a trustee, runs squarely afoul of one of the fundamental duties imposed on all trustees— the duty of loyalty. This is aptly expressed in Restatement (Second), Trusts § 170(1) (1959):

"The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary."

Comment (e) under this section of the Restatement provides:

"The trustee violates his duty to the beneficiary not only where he sells trust property to himself individually, but also where he uses the trust property for his own purposes. Thus, he cannot properly use trust money in his business, or lend trust money to himself, or lease to himself land which he holds in trust."

Restatement (Second), Trusts § 187 provides:

"Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, *except to prevent an abuse by the trustee of his discretion.*" (emphasis supplied)

Comment (d) under this section points out that two of the factors in determining the question of whether the trustee is guilty of an abuse of discretion are: (a) the motives of the trustee in refraining from exercising the power and (b) the existence of an interest in the trustee conflicting with the interest of the beneficiary. Comment (g) points out that a court will control the trustee in the exercise of a discretionary power where he acts from an improper motive, even though that improper motive does not amount to dishonesty; and in determining the question of whether a trustee acts from an improper motive, the

court should consider the fact that the trustee has an interest that conflicts with that of the beneficiary.

These Restatement sections are but formalized refrains from the lyrical theme written by Chief Judge (later Mr. Justice) Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1, describing the strictures the law imposes on the performance of fiduciary undertakings.

> "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. * * * Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd."

There may be some valid explanation that the City can offer as to why its actions did not constitute a breach of its trust, but that point in the development of this cause was never reached. However, in the absence of such a showing, the complaint cogently demonstrated a breach of trust warranting relief. Dismissal of this count without a development of the facts was likewise error.

■ Finally, with regard to Count III of the complaint alleging estoppel, a conventional trial or the summary procedures provided by the Rules was also required. First, as to the averment of the motion that the necessary elements of estoppel had not been alleged with the "particularity required," we refer to Fed.R.Civ.P. Rule 8(a), which provides that a pleading need only contain a short and plain statement of the claim show-

ing that the pleader is entitled to relief. *See also* Wright & Miller, Federal Practice and Procedure, Civil §§ 1356 & 1357. Here the pleading showed much more. The motion to dismiss admitted as true that the representations of the Official Statement and the City's bond-approving attorneys were communicated through authorized representatives of the City to Investors with the intent that they rely thereon as a basis for consummating their purchase of these bonds. It was further alleged that the City acquiesced in these representations and caused Investors to believe that they concurred therein. It was even alleged that if the City had disagreed with its bond attorneys' conclusions, investors would not have purchased the bonds. A clearer basis for equitable estoppel is difficult to conceive.

■ The City contends that these allegations really amount to a claim for fraudulent misrepresentation and therefore should be judged by a more strict standard, that the basis of the estoppel was a matter of opinion and not of fact, and that the City lacked knowledge that the representation was false. Since the foundation for every equitable estoppel is that the misleading party is guilty of actual or constructive fraud, the fraud vis-a-vis estoppel issue presents a distinction without a difference. But basically the thrust of all of the City's positions fails to recognize or meet the core of Investors' allegation. Investors does not claim it was misled about whether moneys would accumulate at a sufficiently rapid rate to pay off the bonds after the call date and before maturity. The claim is that the City led Investors to believe that if such surplus funds did accumulate in the Sinking Fund, then the City was required to and would redeem or purchase the certificates after the 1969 call date.

■ The City contends that estoppel is available as an affirmative defense only and cannot be used as a basis for a cause of action. This is incorrect. Although estoppel is most often pleaded in a defensive way, its equitable sub-

**880**

stance may not be restricted by form. If the facts alleged here are established on trial, they could form a valid basis for the issuance of an injunction requiring the City to perform the acts it promised. No one argues that a municipal corporation is not subject to the doctrine of equitable estoppel and the Florida law on this point is not in doubt. *See e. g.,* Sakolsky v. City of Coral Gables, 151 So.2d 433 (Fla.1963) and City of Naples v. Conboy, 182 So.2d 412 (Fla.1965).

In sum, we hold that the allegations of the third count of the complaint were amply sufficient to withstand the motion to dismiss. For purposes of dismissal, the allegations of Count III established that the City told Investors that if it had the moneys available in 1969 it considered it had to and it would use them to retire these bonds and that Investors believed this representation and, acting on it, bought the bonds. Equally with the language of the other two counts, these allegations in Count III warranted an adversary determination on the merits to find out if this lawyer talk can be translated into proven fact.

The cause is reversed and remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.