**Lawrence B. SHEPPARD and Charlotte N. Sheppard**

v.

**The UNITED STATES.**

No. 195–62.

United States Court of Claims.

June 10, 1966.

Laurens Williams, Washington, D. C., attorney of record, for plaintiffs. Edwin M. Buchen, Hanover, Pa., Alexander M. Heron, John A. Whitney, and Jerome B. Libin, Washington, D. C., of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell

Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

## OPINION

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

### PER CURIAM.

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make appropriate findings of fact and to submit a recommended conclusion of law. The Commissioner has filed a report containing findings, an opinion and recommended legal conclusion. The court adopts the Commissioner's opinion and recommendations concerning "the charitable contributions issue" with minor modifications. The court rejects the Commissioner's opinion and conclusions as to "the depreciation issue." That part of the Commissioner's opinion which has been adopted by the court and the court's opinion on the second issue is as follows:

Only occasionally has the court been required to address its attention to various attributes of members of the animal kingdom.[1] It must do so once again to resolve the dispute in this income tax refund case. The animal involved here is Star's Pride who, in recent years, has established himself as one of the country's great standardbred[2] stallions. Presently, he stands at stud and is owned by Hanover Shoe Farms, Inc. (hereinafter called "The Farms"). But this was not always so, and a determination with respect to the first issue[3] in this case requires a study of Star's Pride's early history.

## THE CHARITABLE CONTRIBUTIONS ISSUE

Star's Pride was foaled in 1947 with a distinguished line of standardbred ancestors. When he was a yearling colt in 1948, he was purchased by plaintiff-taxpayer, Lawrence B. Sheppard,[4] and E. Roland Harriman as equal co-owners. Both men have long been nationally prominent in standardbred racing and breeding circles, and there can be no doubt of their outstanding expertise in the field. For a number of years they raced Star's Pride as a trotter. He distinguished himself on the track and won his owners some $141,000. Then, in 1953, at the age of six, Star's Pride was retired to stud at The Farms, the world's largest breeding farm for harness racehorses. This farm is owned and operated by a closely-held corporation of which plaintiff is president. He owns 76.8 percent of its outstanding stock.

Originally, The Farms took care of and managed Star's Pride under an informal, oral arrangement with his co-owners. In 1958, however, this arrangement was reduced to writing in the form of a lease agreement whereby The Farms, as lessee, agreed to care for and maintain Star's Pride at its sole expense and to use him solely for breeding purposes. The Farms also agreed to pay the owner-lessors $100 for each live foal produced by Star's Pride from The Farms' mares

---

1. See for example, Stubbs v. United States, 86 Ct.Cl. 152 (1937) (silver foxes); Pedersen v. United States, 115 Ct.Cl. 335 (1950) (dogs and cats); Krueger v. United States, 161 Ct.Cl. 599 (1963) (mink); Causby v. United States, 60 F. Supp. 751, 104 Ct.Cl. 342, rev'd 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (chickens).

2. In equine parlance, this word refers to a family, or breed, of horses which have been bred and trained for trotting and pacing, usually under harness. The "standardbred" family is distinct from the "thoroughbred" family. The latter term refers to a family of horses bred and trained for running.

3. There are two issues herein, and for convenience they will be discussed under separate headings, namely, (a) The Charitable Contributions Issue, and (b) The Depreciation Issue.

4. Plaintiff's wife, Charlotte N. Sheppard, is a party hereto solely by reason of her having filed a joint tax return with her husband. Accordingly, in this opinion Lawrence B. Sheppard is referred to either as "plaintiff" or "taxpayer."

and to offer the horse for service to "outside" mares at a fee to be agreed upon between the lessors and lessee from season to season, such "outside" fees to be divided equally among the parties. In addition, it was agreed that the lessors could breed their own mares to Star's Pride at no charge. The lease was executed on January 1, 1958, for an original term of five years with a right of renewal in The Farms for an additional five-year term.

Star's Pride's initial stud fee was set at $750, a rather impressive fee for an, as yet, unproven stallion. A period of time is required to determine the true value of a breeding horse because his success will be measured by the performance of his "get," or offspring. For the first five years of his life at stud, Staf's Pride's record was rather disappointing, and during this early period his "book" (reservations for breeding services) was never filled. Then, in 1958, the situation suddenly changed.

In August 1958, a 3-year-old filly by Star's Pride, named Emily's Pride, won the $107,000 Hambletonian Stake which, for a 3-year-old standardbred horse, is comparable to the winning of the Kentucky Derby by a thoroughbred horse. In addition, another of Star's Pride's get won second place in the Hambletonian. Emily's Pride went on to win the 1958 $53,000 Kentucky Futurity, and as a result of her victories was named the Harness Horse of the Year. Meanwhile, a 2-year-old colt, by Star's Pride, named Diller Hanover, was winning many of the two-year-old trotting classics in the country, and became the winter favorite for the 1959 Hambletonian.

The attentions of the standardbred horse experts immediately focused on Star's Pride. The spectacular successes of his get in 1958 caused a flood of applications to The Farms for his breeding services.[5] By 1960, Star's Pride had advanced to second place in the national standings of trotters. His book has been "full and closed" for every breeding season since 1958.

During 1958, the plaintiff was also observing Star's Pride's progress with great interest. Despite some earlier misgivings about the horse's future, he was now convinced that, with proper development, Star's Pride could become one of the top-ranking stallions of the country. His interest was further sharpened by the fact that The Farms (which he controlled) already owned Hoot Mon, a great stallion descended from one dominant trotting line (Scotland), and by the fact that Star's Pride was descended from the other dominant trotting line (Volomite). He decided that The Farms should acquire Star's Pride, not only to perpetuate the Volomite Line but also to interbreed with the get of Hoot Mon from the Scotland line.

From his extensive experience, plaintiff had long ago concluded that it was not possible to develop the full potential of a stallion at stud without having complete ownership and control of the horse. Accordingly, sometime prior to June 1959, plaintiff determined that, as a first step, The Farms should attempt to acquire Harriman's one-half interest in Star's Pride. On behalf of The Farms, plaintiff negotiated with Harriman who agreed to sell his interest for $100,000 plus a specified number of future free breeding services by Star's Pride for the Harriman mares. This proposal was agreeable to plaintiff, and he followed it through with a formal offer to Harriman on June 12, 1959.

On June 15, 1959, The Farms received a telegram from Daniel Green, Executive Director of the New York Chapter of the American Red Cross, advising that Harriman's interest in Star's Pride and

---

5. Unfortunately for his owners, Star's Pride's service fee for the 1959 breeding season had been set at $750 prior to Emily's Pride's victories and could not be changed. No time was lost, however, in raising his fee to $2,000 for the 1960 breeding season.

The Farms' offer of June 12, 1959, had been assigned to it, and accepting The Farms' offer to purchase such interest.[6] Subsequently, The Farms received a letter of confirmation from Green, and thereupon issued its check for $100,000 to the Red Cross. On June 17, 1959, Green acknowledged receipt of The Farms' check and forwarded Star's Pride's registration certificate, properly endorsed to show the transfer to The Farms of the interest previously owned by Harriman. On the same day, Harriman and The Farms executed a written agreement which specified in detail the breeding services from Star's Pride which The Farms was to reserve for Harriman's mares. As of June 17, 1959, the fair market value of those breeding services was at least $50,000.

At about this time, plaintiff was also considering making substantial charitable contributions to the Sisters of St. Joseph in the City of Philadelphia (hereinafter called the "Sisters") and to The University of Pennsylvania (hereinafter called the "University"). The Sisters owned and operated St. Joseph's Academy, a small school in Pennsylvania which plaintiff's children and grandchildren had attended and in which he had a deep interest. In early June 1959 plaintiff became aware of a serious financial problem at the Academy arising out of a threat by State fire safety officials to close the school unless extensive remodeling and renovation to its building were accomplished by the fall of 1959. The estimated cost for the required improvements was $50,000, and it did not appear that the Sisters, within the time allowed, would be able to raise any such sum. Plaintiff decided to defray the cost by a personal contribution.

Meanwhile, plaintiff had also learned of plans by The University of Pennsylvania to build new facilities for its School of Veterinary Medicine. He also had a deep interest in the welfare and progress of that School, and he intended to make a substantial contribution to its new construction program.

At no time did plaintiff intend to make his contributions to the Sisters and the University in the form of cash. From prior experience he was well aware of the legitimate tax advantages which flow to a donor through the making of deductible charitable contributions in the form of gifts in kind of appreciated property. Originally, he had planned to make the gifts in the form of certain shares of stock. By the middle of June, however, he had changed his mind and decided that, if acceptable to the prospective donees, he would donate to each of them one-third of his one-half interest in Star's Pride.[7] At this point it is important to bear in mind that this decision in no way indicated a lessening of plaintiff's confidence in Star's Pride's potential greatness. To the contrary, the gravamen of his plan was that, immediately following the gifts of the two one-sixth interests in Star's Pride, he would cause The Farms to offer to purchase those interests from the donees for $50,000 each.[8] Thereafter, he intended to sell his remaining one-sixth interest directly to The Farms, also for $50,000. Since The Farms had already acquired the Harriman interest, the end result would be that desired by plaintiff, namely, 100 percent ownership of Star's Pride

6. From prior telephone conversations, plaintiff had been alerted to the probability that Harriman would assign his interest to the Red Cross as a charitable contribution.

7. From the timing involved, it is at least a permissible inference that this idea may have occurred to him as a result of his negotiations with Mr. Harriman who, as we have seen, had informed plaintiff of his intention to give his interest in Star's Pride to the Red Cross.

8. Based on the arm's length Harriman sale, plaintiff had estimated Star's Pride's total value at $300,000, or $50,000 for a one-sixth interest in the horse. Commissioner Fletcher held that plaintiff bore his burden of proving that this value was reasonable. In fact, he said the record proved it to be conservative. In its brief to the court, the government has conceded the point.

by The Farms subject only to the Harriman breeding rights.

On June 16, 1959, plaintiff carried out his plan. He wrote letters to the Sisters and to the University offering to each, as a gift absolute, one-third of his right, title, and interest in Star's Pride, which he described as a one-sixth interest in the horse with a current market value of $50,000. He attached no conditions or obligations to these offers. However, on the same day, in the case of the University, and on the following day, in the case of the Sisters, he sent each donee a letter from The Farms, signed by him as president, by which The Farms offered to purchase the interest of each donee for the sum of $50,000. Each letter contained a paragraph advising that, if the offer was found acceptable, the proper officers of the respective donees should execute and return an enclosed form of bill of sale, upon receipt of which The Farms would make immediate payment.

The significant facts surrounding the offer of gift by Mr. Sheppard and the offer of purchase by The Farms are the following: On receiving the letter offering the gift, the Mother Superior of the Academy called the Mother Superior General who was authorized to receive and convey property on behalf of the Order. The latter questioned the propriety of a Catholic school's keeping a horse which was directly involved in a betting scheme. Upon hearing this, the Mother Superior of the Academy called Mr. Sheppard who said he would see what he could do. It was on the next day that she received The Farms' offer which she took to the Mother Superior General who accepted for the Order. The University, however, maintained a somewhat more cautious, or perhaps more orderly, policy regarding the acceptance of gifts of an unusual nature which might contain restrictions. It did not wish to become involved with donors who had ulterior motives or to lend its tax-exempt status to any person who was trying to use it illegally. Consequently, the offer was not accepted by the University until careful inquiry was made by Dean Allam of the School of Veterinary Medicine to Mr. Gordon, Treasurer of the University. Mr. Gordon in turn consulted with Mr. Pemberton, the Business and Financial Vice President and Dr. G. P. Harnwell, President of the University. Pursuant to this policy, Dr. Harnwell asked Mr. Gordon whether the horse was a valuable one and whether the University by accepting the offer would incur any obligation of any kind to the donor or with respect to the subject matter of the gift. On receiving Mr. Gordon's assurance that, in his understanding, the horse would be a valuable one and that the gift would be unrestricted, Dr. Harnwell expressed the view that the University would accept it. As was customary in matters of this sort, Mr. Gordon also telephoned Calvin H. Rankin of the firm of Drinker, Biddle and Reath, in Philadelphia, counsel for the University. The University communicates with Mr. Rankin for advice and counsel on matters pertaining to gifts on an average of twice a day. Mr. Rankin advised Mr. Gordon, on the basis of the conversation between Mr. Sheppard and Dean Allam, that the proposed gift would not be objectionable from a legal or tax standpoint. Mr. Gordon then informed Dean Allam of his discussions, and Dean Allam informed Mr. Sheppard's secretary that the University would be willing to accept the gift.

On June 17 each donee accepted The Farms' offer, executed and delivered the bill of sale, and later received payment from The Farms in due course. As the recited facts demonstrate, the record is clear that neither donee acted under any legal obligation, express or implied, to accept The Farms' offer of purchase as a condition to accepting plaintiff's gift. However, neither donee "looked the gift horse in the mouth." They made no independent investigation of the value or earnings potential of Star's Pride, nor did they solicit offers from any other sources. Instead, they relied implicitly on plaintiff's integrity and international

reputation for expertise in the field of standardbred horses.

As for plaintiff, he had no real doubt that, despite the absence of any prior commitment by the charities, The Farms would be able to acquire the donated interests for cash. He was aware that, because of their construction programs, they wanted money, not an interest in a breeding stallion. He was also aware that, once the interest was beyond his effective control, there was a possibility that either donee (particularly the University) might shop around for a better offer from other persons interested in standardbred horses. He was willing to assume that risk, however, because he was ready to have The Farms outbid any possible competitor.

On June 17, plaintiff also sold his own remaining one-sixth interest in Star's Pride to The Farms for $50,000 and reported the same on his 1959 income tax return as capital gain. On the same return he claimed a charitable contribution deduction of $50,000 for his gift to the Sisters and a like deduction for his gift to the University. The Commissioner of Internal Revenue disallowed both deductions in their entirety as not being valid gifts.

The Government no longer disputes the validity of the gifts. In its trial brief it "acknowledges" that the plaintiff neither solicited nor received any preliminary commitment from the donees to the effect that they would sell their newly acquired interests in Star's Pride to The Farms, and sums up its argument as follows:

> * * * Rather, we contend that while taxpayer is entitled to a charitable deduction in the amount claimed by virtue of his gifts to the Sisters and to the University, in reality the donations represent nothing more than his transfer to them of a portion of the proceeds of his sale of his entire interest in Star's Pride to the Farms. View-

ing the transaction in that light, taxpayer is thus entitled to the charitable deduction claimed but is nonetheless taxable on the gain realized on the transfer to the Farms of his complete interest, rather than just a portion thereof.

■ Basic to the Government's position is its reliance on the applicability here of the so-called "step transaction" doctrine. This doctrine is but one application of the overworked maxim that truth and substance must prevail over form and appearance.[9] Southern Pacific Co. v. Lowe, 247 U.S. 330, 38 S.Ct. 540, 62 L.Ed. 1142 (1918); Commissioner v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). The argument is that the substance, or reality, of taxpayer's transactions with Star's Pride, as described above, amounted simply to a sale by the taxpayer of his *entire* one-half interest in the horse to his controlled corporation for $150,000, out of which sum taxpayer kept $50,000 and directed the corporation to pay the balance in equal shares to the two charities. In defendant's view, the court should look only to the end result and ignore entirely the preliminary, or intervening, step whereby the taxpayer conveyed two-thirds of his interest in Star's Pride to the charities. The court cannot agree that, in the circumstances of this case, it is permissible to disregard what was done in fact and to substitute in its stead a fictitious, but taxable, transaction which never occurred.

■ The starting point is a long-established rule of tax law as to the virility of which the parties are in full agreement and which is well stated in defendant's brief, as follows:

> It is quite true, * * *, that Congress, in an effort to encourage contributions to charitable organizations, has seen fit to permit a donor to deduct the full value of any gift of appreciated property without reporting as income

---

**9.** The statement has been attributed to the late Roscoe Pound that all such "maxims" should rather be called "min-

ims" since they convey a minimum of information with a maximum of pretense.

from an exchange the appreciation in the value of the property which is thereby transferred.

This has been the law for decades. See L.O. 1118, II–2 Cum.Bull. 148 (1923). The taxpayer here was well aware of it, and the record is clear that he planned his charitable gifts so as to take full advantage of the rule. However, for the court to approve of his actions, says defendant, would be to create a "wholly new and startling concept," namely, that a taxpayer may take advantage of the above rule even when, "in reality, he does not part with control over the property supposedly conveyed." Defendant contends that judicial sanction of any such rule would lead to widespread tax avoidance.

■ As an abstract proposition, no doubt defendant's contention is well-founded. The grave difficulty with it, as applied to this case, is that it assumes as a fact something which on this record is not true, namely, that plaintiff did not actually part with his interest. But, to use defendant's word, the "reality" of the present situation is that the taxpayer *did* in fact part with two-thirds of his interest in Star's Pride when he made the gifts here involved.

The proof is clear and convincing that there were no prearrangements or commitments entered into between taxpayer and the two charities, nor did he place any conditions upon, or tie any strings to, his gifts. Legally speaking, the charities were as free to deal with their donated interests as any other owner would be. As a matter of fact, the Mother Superior testified that the Academy would have sold to someone else had the bid price been higher, after Mr. Sheppard had been notified. She testified she relied on his judgment in the matter and felt she owed him, as the donor of the gift, this respect.

Indeed, the defendant does not appear to controvert this, but it points vigorously to the taxpayer's candid testimony to the effect that, in his own mind, he felt confident The Farms' offer to purchase the interests from the charities would be accepted by them. That the reasoning which led him to this unilateral conviction was entirely sound is perhaps best demonstrated by the alacrity with which both charities accepted The Farms' offer.

The fact remains, despite defendant's refusal to face it, that following the gifts there was a period of time, albeit short in duration, when plaintiff had lost control of two-thirds of his interest in Star's Pride. During that period he was exposed to the possibility, however remote he might have considered it, that The Farms might not succeed in purchasing the donated interests short of increasing the amount of its offers.

The compelling answer to defendant's contention here, then, is that, under the circumstances of this case, the "form" and the "substance" were identical. This must necessarily follow from defendant's concession—a realistic one under this record—that plaintiff's gifts were valid ones and were made with no prearrangements or conditions. Defendant asks too much of the step transaction doctrine when it says that, despite the reality of plaintiff's gifts and the subsequent purchase by The Farms, there was nonetheless a sale by plaintiff to The Farms of his entire interest in Star's Pride. Such an application of the doctrine would twist two actual transactions into two transactions which never in fact occurred, a sort of "let's pretend" approach. But, as Mr. Justice Holmes once remarked, "a fiction is not a satisfactory reason for changing men's rights or liabilities." Holmes, Collected Legal Papers, 49 (1921). Useful as the step transaction doctrine may be in the interpretation of equivocal contracts and ambiguous events, it cannot generate events which never took place just so an additional tax liability might be asserted.

The case of United States v. General Geophysical Co., 296 F.2d 86 (5th Cir., 1961), cert. denied 369 U.S. 849, 82 S.Ct. 932, 8 L.Ed.2d 8 (1962), primarily relied on by defendant, is not to the contrary. There several stockholders of a closely-held corporation desired to retire their

stock. This was accomplished by the stockholders transferring their stock to the corporation in return for which they received cash and 47 percent of the corporate properties, the total being equal to the agreed fair market value of the surrendered stock. A few hours later the corporation bought back its properties from the stockholders by issuing them its secured notes. The cost of the properties when reacquired by the corporation was considerably greater than their original basis to the corporation because of the reacquisition at then fair market values. Accordingly, in computing its depreciation deductions, the corporation ·claimed that it had acquired a new and stepped-up basis for those properties. However, the court did not believe that by the transactions with its withdrawing stockholders, the corporation had genuinely severed its ownership of the properties involved. It stated at 296 F.2d 89–90:

> The facts of these transactions will not support a holding that the corporation had terminated its ownership for these purposes. It parted with bare legal title to the property for a few short hours. It made no physical delivery of any of the assets. Its control and use of the property were never interrupted. Even the surrender of its legal title was made under circumstances creating a strong expectation that it would be returned shortly. True, the stockholders may have had complete legal freedom to refuse to resell the assets to the corporation, but there was almost no likelihood that they would do so. It was a foregone conclusion that they would resell the assets to someone, since the very reason for the original redemption was that the stockholders did not wish to continue ownership of the assets and management of the business. And

since the assets were already integrated into the operations of the taxpayer and represented 47% of its assets, the taxpayer was the logical, and as a practical matter, the only possible purchaser. That the stockholders had already drawn up papers for the resale, in case they decided to make one, undoubtedly strengthened the confidence with which the taxpayer could look forward to the reacquisition of the properties. There was never the whisper of a suggestion that the company was to cut down on its operations, as would be inevitable if it permanently parted with 47% of its assets, including three rigs. The most that can be said is that the taxpayer gave to the bank and Mrs. Johnson the power to divest it of its ownership of certain properties; they held that power for a few hours and then returned it. The transactions, from the corporation's standpoint, were more like an option than a sale, and the option expired quickly without having been exercised.

Significant differences between *General Geophysical* and the present case are at once apparent. Here the property transfer was to independent and unrelated third parties, not to withdrawing stockholders of a corporate property owner.[10] The severance by plaintiff of two-thirds of his ownership in Star's Pride was clear and distinct[11] as opposed to the court's finding that the transaction in *General Geophysical* was more like an option than a sale. Further, all similarity between the two cases dissolves into the fact that, unlike *General Geophysical,* the asset involved here *did not come back to the original owner.* It was conveyed by the plaintiff to the charities as a gift and then, in turn, sold by the charities to The Farms—*an entirely different taxpayer.*[12]

10. The underlying purpose of the title shuffling in *General Geophysical* was to afford the stockholders the position of secured creditors with respect to the unpaid balance due on the redemption of their stock.

11. Apparently, the Government would agree that plaintiff divested himself of owner-ship. It opts only for a different transferee, i. e., The Farms instead of the charities.

12. Although plaintiff owns 76.8% of The Farms' outstanding stock, the record discloses no reason for the court to disregard the corporate entity and to treat plaintiff and The Farms as one. Ob-

Defendant also relies on the *Kimbell-Diamond* doctrine which holds that when stock in a corporation is purchased for the purpose of acquiring its underlying assets and that purpose is continued until the assets are taken over, no independent significance taxwise attaches to the several steps of a multiple step transaction. The final step (such as liquidation, reorganization, merger, dissolution, etc.) is therefore viewed not as independent of the stock purchase but simply as one of the steps in a unitary transaction, the purchase of assets. See Kimbell-Diamond Milling Co. v. Commissioner, 14 T.C. 74, aff'd per curiam, 187 F.2d 718 (5th Cir., 1951), cert. denied 342 U.S. 827, 72 S.Ct. 50, 96 L.Ed. 626; Georgia-Pacific Corporation v. United States, 264 F.2d 161 (5th Cir., 1959).

■■ Thus, the teaching of *Kimbell-Diamond* and related cases is that, under appropriate circumstances, a court will telescope two or more transactions into a single transaction by disregarding intermediate steps. However, the Government does not appear actually to be contending for any· such compression. As plaintiff points out, the two transactions here were: (1) the donation of the property by plaintiff to the charities, and (2) the sale of that property by the charities to The Farms. The Government does not attempt to disregard intermediate parts of the two transactions and compress the two transactions into one. · Rather, the Government seeks to transmute them into two entirely different transactions: (1) a sale of the property by plaintiff to The Farms, and (2) a donation by him of the sale proceeds to the charities. Thus, the Government's theory in no way compresses or simplifies the transactions. The Government merely winds up with two different transactions under its hypothetical approach, each involving as many steps as were present in the two transactions as they actually occurred. Accordingly, the *Kimbell-Diamond* line of cases is inapposite here.[13]

More in point here is the Tax Court's recent decision in The Humacid Co., 42 T.C. 894 (1964). There, one Huntsinger was the majority stockholder of a holding company and also was the owner of five unregistered promissory notes issued by a wholly-owned subsidiary of the holding company. The subsidiary had a net operating loss carryover which was due to expire at the close of the taxable year. Huntsinger decided to utilize the balance of the subsidiary's loss carryover by having the subsidiary make bargain purchases of its notes, thereby realizing income which would be absorbed by the about-to-expire loss carryover. However, in order to avoid the possibility of ordinary income to himself, Huntsinger sold two of the subsidiary's promissory notes to a business acquaintance, at a

viously, defendant does not contend for *alter ego* treatment, since it is essential to its contention for recognition of capital gains to plaintiff that The Farms be recognized as a separate entity. Neither does defendant contend that section 1239 of the Internal Revenue Code of 1954 should be used to subject plaintiff to ordinary income treatment as the price for stepping-up the horse's basis to The Farms; plaintiff does not own more than 80% of The Farms outright and by attribution from his spouse or minor children and grandchildren (his two daughters own 9.1% but they are adults).

13. Common to the step transaction cases is the factor of an integrated plan or "critical" interrelationship of all the steps. See e. g., American Bantam Car Co. v. Commissioner, 11 T.C. 397, 406 (1948),

aff'd per curiam, 177 F.2d 513 (3d Cir. 1949), cert. denied, 339 U.S. 920, 70 S.Ct. 622, 94 L.Ed. 134 (1950). On the facts of the present case, the court is persuaded that the "steps" in plaintiff's plan were not so critically interrelated that one could not have taken place without the other. The gifts to the charities were absolute and unconditional; the subsequent purchase by The Farms was entirely separate and not prearranged; the transactions were independent of one another. Cf. United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251 (1950). No doubt plaintiff made a very shrewd assessment of the disposition of the charities to accept The Farms' offer without attempting to get competitive bids, but the realities were such that his assessment could

price equal to 80 percent of their face value. As an integral part of this purported sale transaction, the business acquaintance entered into an agreement with the subsidiary which (1) gave the subsidiary an option to purchase the notes from him at any time within a stated period for a price equal to about 86 percent of their face value and (2) obligated the subsidiary to purchase the notes from him for that amount by no later than the end of that period.

In addition, Huntsinger endorsed and assigned the other three notes which he held (in face amount aggregating $41,-000) to three charitable institutions, as absolute and unconditional gifts.

Eight days before the close of the taxable year, the subsidiary exercised its option and redeemed the two notes held by Huntsinger's business acquaintance. Eleven days after Huntsinger had assigned the other three notes to the charities, the subsidiary under Huntsinger's control wrote to each of the charities, offering to redeem the three notes they held for 80 percent of their face value. Each of the charities accepted the offer and the subsidiary redeemed the notes shortly before the close of the year.

With respect to Huntsinger's transaction with his business acquaintance, the Tax Court concluded that there had been "no real sale" of the notes, and that his business acquaintance had merely served as a "conduit" through whom the redemption occurred. With respect to the char-

ities, however, the court found that Huntsinger had made valid, absolute, and unconditional gifts of all his right, title, and interest in those three notes, and that their redemption was, in fact, a redemption from the charities and not from Huntsinger. In rejecting the Government's argument that the charitable organizations were mere conduits of income belonging to Huntsinger,[14] the court said:

> The law with respect to gifts of appreciated property is well established. A gift of appreciated property does not result in income to the donor so long as he gives the property away absolutely and parts with title thereto before the property gives rise to income by way of a sale. [Citing cases.]

The *Humacid* case is persuasive authority in plaintiff's favor. The Tax Court's careful analysis of the different treatment to be accorded a conditional transaction as opposed to one with no strings attached militates strongly against defendant's contention that plaintiff's unconditional gifts of interests in Star's Pride should be ignored.

The court is not unmindful of the tax benefits which flow from affording full recognition to the plaintiff's admittedly tax-motivated transactions in this case. Such motivation demands special analysis and scrutiny, but its presence is essentially immaterial except as an eye-opening mechanism or interpreter of equivocal conduct.[15] It will not negative the effect of transactions which have really

---

have been proved wrong and his plans knocked into a cocked hat.

For a case involving a charitable contribution which applied the step transaction doctrine to cause the realization of capital gains income, see Magnolia Development Corp., T.C.Memo. 1960–177, CCH Tax Ct.Mem. 934 (1960).

14. At the heart of the government's argument in *Humacid* was the idea that the taxpayer had made an anticipatory assignment of income. Under the doctrine established by Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940), such income is realized by the transferor. In the present case, this seems to be the thread running through the government's

argument. However, as in *Humacid*, the transfer was of property and not of a bare right to income as in *Horst*, and the government has not been able to show either how the court can or why it should break the property down into its "property" and "income" components.

For a recent review of the problems in this area, see Lewis, Income Realization and Charitable Contributions: The Economics of Altruism, 54 Geo.L.J. 482, 500–505 (1966).

15. " * * * I do not understand that a taxpayer must sit by idly twirling his thumbs until a tax liability alights upon him. If he is warned of its approach, if he sees it coming, he may seek such

occurred. Commissioner v. Brown, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965). As Mr. Justice Douglas has said:

> * * * Congress may be strict or lavish in its allowance of deductions or tax benefits. The formula it writes may be arbitrary and harsh in its applications. But where the benefit claimed by the taxpayer is fairly within the statutory language and the construction sought is in harmony with the statute as an organic whole, the benefits will not be withheld from the taxpayer though they represent an unexpected windfall. Lewyt Corporation v. Commissioner of Internal Revenue, 349 U.S. 237, 240, 75 S.Ct. 736, 739, 99 L.Ed. 1029 (1955).

Other cases which, although differing in their factual situations, provide substantial support for plaintiff's position here are Campbell v. Prothro, 209 F.2d 331 (5th Cir., 1954); Richardson v. Smith, 102 F.2d 697, 125 A.L.R. 774 (2d Cir., 1939); Granite Trust Co. v. United States, 238 F.2d 670 (1st Cir., 1956); Apt v. Birmingham, 89 F.Supp. 361 (N. D.Iowa, 1950); and Stuart A. Rogers, 38 T.C. 785 (1962). Cf. S. M. Friedman, 41 T.C. 428 (1963). Accordingly, for all of the foregoing reasons, the plaintiff should prevail on the charitable contributions issue.

## THE DEPRECIATION ISSUE

The second issue, while involving a relatively small amount of tax dollars in the present case, is one of nationwide significance to taxpayers and the fisc alike. It brings into question the propriety of any depreciation deduction on an asset in the year that the asset is disposed of for an amount that exceeds its adjusted basis. During the past few years, a storm of controversy has raged over this issue to a point where the United States Supreme Court determined to resolve the question by granting the writ of certiorari in the case of Fribourg Navigation Company v. Commissioner, 335 F.2d 15 (2d Cir., 1964), rev'd, 383 U.S. 272, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966), discussed further below.

The issue arises in this case on these facts. During 1958 and 1959, plaintiff [16] owned over 30 standardbred horses which he held for breeding and racing purposes. In the computation of depreciation allowances on these horses, plaintiff estimated their useful lives in accordance with the recommendations contained in Internal Revenue Service Bulletin F. Because of the fact that at the end of its useful life a horse has practically no market value, plaintiff estimated salvage values on his horses at zero. Although he customarily held his horses until the end of their useful lives,[17] he occasionally sold horses which did not meet his performance standards, or in some instances when a particular horse showed promise, he would sell it to The Farms for special development.

During 1958, plaintiff sold five of his horses, prior to the end of their estimated useful lives, at prices in excess of their adjusted bases after giving effect to normal depreciation allowances for the year. In 1959, five other horses were sold, prior to the end of their estimated useful lives,[18] also at prices in excess of

shelter as the law offers in an effort to escape it or diminish its blow. Of course, by examination, it must be determined whether the shelter he reaches is really constructed of statutory material, and by close scrutiny of the facts it must be determined whether the taxpayer really got himself and his transactions within it. But he should not be counted out merely because the shelter lies off his beaten path and he scurries for it." Member Goodrich, dissenting, in George H. Chisholm, 29 B.T.A. 1334, 1346, rev'd

79 F.2d 14 (2d Cir. 1935), cert. denied 296 U.S. 641, 56 S.Ct. 174, 80 L.Ed. 456 (1935).

16. See footnote 4, supra.

17. When, by reason of age or disease, a horse became too weak to rise to its feet, it was the general practice to destroy the animal.

18. On an average, each of the horses sold during the two years had a remaining useful life of approximately five years.

their adjusted bases after giving effect to normal depreciation allowances for the year. Moreover, with respect to four of the five horses sold in 1959, the sales prices exceeded adjusted bases after giving effect to depreciation taken even in the year *prior* to sale.

Although he did not challenge the correctness of the estimated useful lives used by plaintiff, the Commissioner of Internal Revenue took the position that the sales price of each horse represented its salvage value and that any depreciation claimed in the year of sale, or in years prior to sale, which reduced adjusted basis below sales price ("salvage value") could not be allowed.

In its brief, the defendant has conceded that the Commissioner was not authorized to disallow depreciation deductions claimed in years *prior* to the year of sale. This concession leaves for decision the sole question of whether, when a depreciable asset is sold prior to the end of its estimated useful life in the taxpayer's business, the fact that it is sold at a price in excess of its adjusted basis deprives the taxpayer of a depreciation deduction for the year of sale.

Commissioner Fletcher in his opinion held that the taxpayer was not entitled to recover on this issue, relying on the Second Circuit's opinion in Fribourg Navigation Co. v. Commissioner, supra. Since the Commissioner's opinion was filed in this case the Supreme Court reversed the lower court in the Fribourg case, 383 U.S. 272, 86 S.Ct. 862 (1966), holding that the taxpayer can deduct depreciation in the year of sale below salvage value as set by the sale price. The government has now conceded that this taxpayer is entitled to recover on the depreciation issue.

Accordingly, defendant's disallowance of plaintiff's depreciation deductions on the horses here involved for the year of their sale is overruled and plaintiff is entitled to recover on this issue.