WILLIAM D. PITYO AND PATRICIA A. PITYO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7445–76.     Filed May 15, 1978.

*Sherwin P. Simmons, William Kalish, Merritt A. Gardner, John J. Trenam,* and *Rolfe D. Duggar,* for the petitioners.
*Stuart B. Kalb,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' joint Federal income tax for 1972 in the amount of $151,549. As a result of concessions by petitioners, the sole issue remaining for decision is whether petitioners are entitled to report the gain on the sale of certain securities on the installment method under section 453.[1]

## FINDINGS OF FACT

Petitioners William D. Pityo and Patricia A. Pityo, husband and wife, were legal residents of St. Petersburg, Fla., when they filed their petition. They filed a joint Federal income tax return for 1972 with the Internal Revenue Service Center, Chamblee, Ga.[2]

During 1967 petitioner acquired a substantial block of common stock of Arvin Industries, Inc. (hereinafter Arvin), a public company whose stock was traded on the New York Stock Exchange. Petitioner received his Arvin stock as a result of a reorganization through which Arvin acquired a company in which petitioner theretofore owned a 20-percent interest. Thereafter, petitioner was employed as a vice president of Arvin, until 1971, when he terminated his employment due to a back injury. From 1971 to 1974 he was unemployed. After

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue.

[2]References herein to petitioner in the singular are to William D. Pityo, his wife being a party to this case solely by reason of having filed a joint return with her husband for the year in question.

leaving Arvin, petitioner received income from dividends on his Arvin stock and from investments in oil wells; however, during 1972 his income from these sources was insufficient to meet his expenses and obligations. During 1971 or 1972, two businesses in which petitioner had invested approximately $175,000 failed, resulting in the total loss of his investments. In connection with these investments he remained liable to banks for approximately $200,000.

During the summer of 1972, petitioner discussed his financial affairs with Grady W. Ray (Ray), a stockbroker and financial adviser. Ray realized that petitioner's holdings of Arvin stock constituted approximately 90 percent of his assets, and that the dividend yield was very low—approximately 2 percent. Ray suggested to petitioner an installment sale of some of his Arvin stock to an irrevocable trust for the benefit of petitioner's family. Ray explained that such a sale would provide a steady flow of income to petitioner over a period of years, would spread the income tax impact of the substantial appreciation in the stock through utilization of the installment reporting method, and would provide a trust fund for the benefit of petitioner's family.

Ray also discussed with petitioner possible investments by the trust (in lieu of continued holding of the Arvin stock), including mutual funds, which would enable the trust to meet the periodic note payments to petitioner. In this connection he showed petitioner certain data from three different mutual funds, illustrating the potential benefits of mutual fund periodic withdrawal plans.

Under such a plan a lump sum is invested under an arrangement with the fund that the investor is thereafter to receive a regular periodic cash payment at such intervals and in such fixed amount as the investor may designate. Any dividends payable with respect to the participant's shares are held by the fund until needed to make a regular withdrawal payment. To the extent that the withdrawal payment exceeds the amount of any such withheld dividends, the excess is paid by redemption of shares. The illustrations Ray provided petitioner, which were based upon actual market histories of the three funds over long periods of years, showed that such an investment plan could result in substantial long-term growth of capital, notwithstand-

ing periodic withdrawals which may in total exceed the original principal amount.

Petitioner consulted with Richard Thayer (Thayer), an attorney, who recommended that petitioner proceed with the establishment of the trusts and the installment sale to the trusts. Petitioner then sought a trustee. During 1972 petitioner was a stockholder and a member of the board of directors of the Marine Bank of St. Petersburg. In early fall of 1972 petitioner discussed the proposed installment sale transaction with the president of the Marine Bank, Fred Seiber (Seiber). At that time the Marine Bank did not have trust powers, and Seiber recommended that petitioner utilize the trust department of the Flagship Bank of Tampa (hereinafter the Flagship Bank or the bank), an affiliate of the Marine Bank.

Subsequently, petitioner, Seiber, and Ray met with R. L. McCarter (McCarter), a trust officer of the Flagship Bank, to discuss the proposed transaction and petitioner's objectives. At this meeting Ray and McCarter discussed possible reinvestment vehicles for the trust, which would enable it to make the payments on the installment note to petitioner. Ray pointed out that it was petitioner's general concept that the trusts would sell the Arvin shares and reinvest the proceeds in mutual funds. Ray showed McCarter the mutual fund projections which he had shown petitioner, indicating the long-term potential of mutual fund periodic withdrawal plans. At the conclusion of the meeting, the bank agreed to serve as trustee for the planned trusts.

Later, McCarter and petitioner's attorney, Thayer, discussed the proposed transaction at length, including specifically the desire of petitioner that the trustee invest in mutual funds. McCarter advised Thayer, who was to draft the trust documents, that the documents should contain some specific direction or authorization for such investment by the trustee.

As a general rule, the bank, as trustee, would not invest trust assets in mutual funds without specific authorization in the trust instrument. In cases where the bank would receive mutual fund shares as a contribution to a trust, if it had absolute discretion, the bank preferred to dispose of them. This was in part due to a Federal Reserve policy disfavoring trust investments in mutual funds because the fees charged by mutual fund managers

represent a duplication of the fees charged by the bank as trustee.

On December 13, 1972, an execution conference was held in McCarter's office, attended by petitioner, Ray, Thayer, McCarter, Seiber, and another bank trust officer, Warren Kohn (Kohn). At this conference petitioner executed documents establishing five separate, but substantially identical, irrevocable trusts, one for his wife and one for each of his four children—Cameron, Johan, Tracy, and Robin. The Flagship Bank was named sole trustee of each trust, but the settlor reserved the right to remove the trustee and name another bank as a substitute.

The trusts for petitioner's wife, Patricia, and two of his children, Cameron and Johan, provided for termination 25 years from the date of establishment, or earlier (but not before 18 years in Patricia's trust and 22 years in the children's trusts) in the discretion of the trustee, provided that all trust liabilities are paid. These trusts also contained the following provisions:

4. * * *

The Trustee is specifically authorized and empowered in its sole discretion:

(a) To retain any and all stocks, bonds, notes, securities, and/or other property constituting the original Trust Fund or added thereto, without liability on the part of Trustee for any decrease in value thereof.

* * * * * * *

7. It is the Settlor's desire, belief and specific direction that the funds of this Trust, and Trusts after Settlor's death, be invested in shares of registered investment companies, commonly called "mutual funds", until such time, in the sole discretion of the Trustee, that such form of investment is a wholly undesirable form of investment for the purposes for which the Trust has been established. The Settlor is fully cognizant of the facts that fees must be paid to both the Trustee and any or all of the above said registered investment companies for the investment and management of the Trust Funds and the Settlor is willing and agreeable to the payment of such fees in order to obtain the above forms of investment.

Petitioner made an initial gift of 500 Arvin shares to each of the four children's trusts and 1,500 Arvin shares to his wife's trust. This gifted stock had an aggregate value of $100,187.50, or $28.625 per share (the closing price of the stock on the day of the gifts), and gift tax returns reflecting the gifts were duly filed.

Also at the December 13, 1972, execution conference, immediately following the foregoing transactions, petitioner and the

trustee entered into installment sales contracts for the sale by petitioner of Arvin shares to three of the trusts as follows:

| Trust | Shares sold |
|---|---|
| Patricia A. Pityo | 12,500 |
| Cameron Pityo | 4,500 |
| Johan Pityo | 4,500 |

The trustee-purchaser executed an installment note for each of these three trusts; the aggregate face amount of these notes was $1,032,000. Of this amount $375,937.21 was considered by the parties as imputed interest, on the basis of 5 percent per annum discounted over a 20-year period. The installment notes provided for payments which, together, totaled $4,300 per month for 240 months.

At the execution conference, Ray was designated to act as the trustee's broker and investment adviser for transactions involving the Pityo trusts. This was in accordance with normal practice by which the bank, as trustee, utilizes the broker of the grantor of the trust. Following the execution conference, Ray met with Kohn, the bank's trust officer, and it was agreed that Ray should sell a portion of the trusts' Arvin shares and reinvest the proceeds in three designated mutual funds. During the period December 14 to December 19, 1972, the trustee sold 15,400 of the 21,500 Arvin shares in the open market for a total of $432,600 ($28.09 average price per share).

During the period December 15 to December 29, 1972, the proceeds of the Arvin sales were reinvested in three different mutual funds, and the trustee executed the appropriate forms to establish periodic cash withdrawal plans with each fund. With respect to each of the three installment plans, the trustee specified that quarterly withdrawal payments were to be made in the amount of $4,300. The quarterly withdrawal dates were staggered in such a way that the trustee received $4,300 from one of the three funds each month. This was the same total amount that the trustee was required to pay to petitioner each month under the terms of his installment notes.

Subsequent to the creation of the trusts and the sale of the Arvin shares to the trustee, petitioner had no contact with the trustee except on one or two occasions when a trust officer telephoned him to ascertain the cost basis of the original gift shares.

In his income tax return for 1972, petitioner computed the gain from his sale of 21,500 Arvin shares to the trusts as follows:

Selling price ..................................... [1]$656,063
Basis of shares sold ............................. 33,665
Net gain ......................................... 622,398

[1]This represents the face amount of the installment notes, $1,032,000, less the imputed interest of $375,937.21, and rounded to the nearest dollar.

Petitioner elected to report the foregoing gain under the installment method provided by section 453. Having received no cash payment with respect to the installment sales in the year of sale, 1972, he reported no portion of this gain in his 1972 return.

Respondent disallowed petitioner's installment sale election and determined that the 15,400 shares of the 21,500 shares transferred to the three trusts were sold by the trustee pursuant to petitioner's instructions with the result that petitioner realized a long-term capital gain of $445,810.66 and additional taxable income of $222,905, computed as follows:

$$\frac{[1]15,400}{[2]21,500} \times {}^{3}622,810.66 = \$445,810.66$$

Long-term capital gain realized as computed above .......................... $445,810.66
Less: Code sec. 1202 deduction .................................................... 222,905.33
Taxable long-term capital gain (rounded off) .................................... 222,905.00
Gain reported on return .............................................................. 0
Increase in income .................................................................. 222,905.00

[1]Shares transferred to the three trusts sold, pursuant to petitioner's instructions, by the trusts in December 1972.
[2]Shares transferred to the three trusts.
[3]Long-term capital gain realized per return.

In April 1976, Patricia A. Pityo requested from the trustee a distribution of $10,000 to her from the assets of the Patricia A. Pityo Trust. At that time the assets of the trust had a market value of approximately $184,000, and the trust's note payable to petitioner had a remaining balance of $500,000. The trustee denied the requested withdrawal for the reasons that the trust instrument did not grant authority, prior to termination, for withdrawals of principal and authorized withdrawals of income only after payment of all expenses and liabilities.

## OPINION

Section 453(b) and its accompanying regulations provide, in part, that at the election of the taxpayer, income from the sale

of personal property (other than a kind which is subject to treatment as inventory) may be reported under the installment method of accounting. The purpose of the installment method of reporting income is to permit the spreading of the tax over the period during which payments of the sales price are made. Thereby the seller actually realizes the profit arising out of each installment before the full tax is paid. Otherwise, the taxpayer would be subjected to the hardship of bunching the gain in one year, often prior to the receipt of a substantial portion of the anticipated sales proceeds. *Burnet v. S. & L. Bldg. Corp.*, 288 U.S. 406, 413–414 (1933); *Pozzi v. Commissioner*, 49 T.C. 119, 126 (1967).

To qualify for reporting income under the installment method, however, the payments (exclusive of evidence of indebtedness of the purchaser) in the year of sale may not exceed 30 percent of the selling price. Petitioner contends that he sold 21,500 shares of his Arvin stock on December 13, 1972, to the three trusts which he created on that date and received installment obligations calling for payment of the entire sales price at the rate of a total of $4,300 per month for 240 months. Since he did not receive any part of the sales price in the year of the sale, he maintains he is entitled to report his gain under the installment method. Respondent, on the other hand, contends that petitioner constructively received the proceeds from the trusts' sale of the Arvin stock on the open market in 1972 and that petitioner is, therefore, taxable in that year on the full amount of the realized gain attributable to the portion of the shares resold.

We hold for petitioner.

The precise issue to be decided must be borne in mind. Respondent does not contend that petitioner is attempting to convert what would be ordinary income into capital gain. The parties agree that the gain on the sale of the Arvin stock is subject to capital gain treatment. Nor is petitioner attempting to shift some of his income to the trusts or some other entity. Petitioner acknowledges, expressly or implicitly, that all gain on his sale of the Arvin stock to the trusts is taxable to him. The only question is whether petitioner must pay an income tax on the gain at the time of the trusts' sales of 15,400 shares in 1972, or only in later years when he actually receives the installment payments on the trusts' notes.

The answer to that question depends on whether, as contended

by respondent, the trustee was a mere conduit of title for petitioner's sale of the Arvin stock on the open market, or whether petitioner made a completed sale of the stock to the trusts without retaining control over the trusts or the proceeds realized by them from the subsequent open-market sales.

Respondent is on solid ground in arguing that careful scrutiny must be given the entire transaction between petitioner and the trusts to ascertain the realities. "A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). Respondent is equally correct in pointing out that taxation is not so much concerned with "the refinements of title" as it is with the actual "command over the property taxed" and that such command may be exercised directly or through "the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency." *Griffiths v. Commissioner*, 308 U.S. 355, 357–358 (1939). But not every sale of appreciated property followed by a resale of such property should be treated as having merely passed through a conduit to the ultimate purchaser. See, e.g., *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950); *Sheppard v. United States*, 361 F.2d 972 (Ct. Cl. 1966). It is "for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs." *United States v. Cumberland Pub. Serv. Co., supra* at 456; *Hallowell v. Commissioner*, 56 T.C. 600, 606–607 (1971).

The test to be applied was stated in *Rushing v. Commissioner*, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969), where the taxpayers, after voting to liquidate their corporation, created trusts for the benefit of their children and sold their stock to the trustee in consideration of cash and installment notes. The Court of Appeals, rejecting an attack on the taxpayers' right to report their gain on the installment basis, stated (441 F.2d at 598):

a taxpayer certainly may not receive the benefits of the installment sales provisions if, through his machinations, he achieves in reality the same result as if he had immediately collected the full sales price, or, in our case, the full liquidation proceeds. *As we understand the test, in order to receive the installment sale benefits the seller may not directly or indirectly have control over the proceeds or possess the economic benefit therefrom.* [Emphasis added.]

Petitioner has met this test. The evidence shows that the Pityo

trusts were not petitioner's controlled interests or subservient agencies. Cf. *Griffiths v. Commissioner, supra*. They were not mere conduits of title to the 15,400 shares of Arvin stock which were sold. *Commissioner v. Court Holding Co., supra*. They were viable entities with an independent trustee, and the trustee had the normal fiduciary obligations and responsibilities to the beneficiaries imposed by law. In substance as well as form, petitioner sold 21,500 shares of the Arvin stock to the trusts; the trusts resold 15,400 of those shares on the market; and after the transfer of the stock to the trusts, petitioner could look only to the payment of the installment obligations as they came due for the recovery of the sales proceeds.

The circumstances of the creation of the Pityo trusts and the sale of the Arvin stock to them, set forth in detail in our Findings, are important. For more than a year prior to the creation of the trusts, petitioner had been partially disabled and had been unemployed. He had lost $175,000 in two business ventures and remained liable to banks for approximately $200,000 in connection with these investments. Over 90 percent of his wealth was concentrated in one stock, the Arvin stock, which yielded a relatively low dividend. His income was not sufficient to meet his financial needs.

Petitioner saw in the creation of the trusts, their subsequent sale of the Arvin stock, and the investment of the proceeds in mutual funds, an opportunity to increase his current income, to gain an estate planning advantage by transferring assets out of his estate, and at the same time to shift future appreciation of a portion of his property to the trusts and their beneficiaries.

The long-term performance record of mutual funds at the time the Pityo trusts were created indicated that all of these objectives could be achieved by following the course of action which petitioner pursued. An illustration of an actual fund's historical record (similar to the ones reviewed by petitioner and the trustee), introduced in evidence, shows that if $250,000 had been invested on January 1, 1953, and $1,649.89 had been withdrawn each month over the following 20 years, a total of $395,980 would have been withdrawn, and the value of the balance remaining invested in the fund as of December 31, 1972, would have been $1,411,457. Other mutual funds had similarly remarkable performance records.

A key element in achieving these financial and family goals

was the installment sale to the trusts. It gave petitioner a regular source of income, in excess of the meager Arvin dividends, to cover his living and other personal expenses. Had petitioner personally sold the Arvin stock on the market, he thereby would have incurred a large, immediately payable capital gains tax liability which would have taken a big portion of his estate.[3] The installment sale alternative allowed him to spread the tax over the payout period of the notes and effectively preserve for reinvestment the funds which otherwise would have been immediately used to pay the capital gains tax.

In carrying out his plan, petitioner selected an attorney to draft the trust instruments and selected the Flagship Bank to serve as trustee. Petitioner had no prior connection with the bank or its officers and in no respect sought to influence it in the discharge of the bank's fiduciary responsibilities. We have no reason to doubt the truthfulness of the attorney's testimony that he received directions from petitioner as to the dispositive paragraphs of the trust instruments but received no instructions from petitioner as to the other provisions, especially those portions of the trust instruments dealing with the trustee's powers. The attorney, as well as a representative of the bank, repeatedly told petitioner that, by creating irrevocable trusts, he would relinquish all control over the Arvin stock and would have no voice in the trustee's investment decisions.

Nor do we have any reason to disbelieve the testimony of the Flagship Bank's principal trust officer that he requested petitioner's attorney to insert in the trust instrument the provision, quoted in our Findings, dealing with investments in mutual funds. That provision was designed to give the trustee specific authority to invest in mutual funds in order to comply with a general policy of the Federal Reserve Banks against double management fees unless authorized by the trust instrument. The testimony indicates that the trustee treated that provision as a power, not a direction. Indeed, the trustee initially

---

[3]In *Rushing v. Commissioner*, 441 F.2d 593, 598 (5th Cir. 1971), affg. 52 T.C. 888 (1969), the court said:

"a taxpayer may, if he chooses, reap the tax advantages of the installment sales provision if he actually carries through an installment sale, even though this method was used at his insistence and was designed for the purpose of minimizing his tax."

See also *Williams v. United States*, 219 F.2d 523, 527 (5th Cir. 1955); *Pozzi v. Commissioner*, 49 T.C. 119, 128 (1967).

sold (for reinvestment in mutual funds) only 15,400 out of the 24,000 Arvin shares transferred to the three trusts. As late as May 31, 1977, the three trusts continued to hold over 8,000 shares of Arvin stock. The record shows that petitioner instructed no one on the sale of the Arvin stock or on the purchase of the mutual funds. In fact, petitioner had no contact with the trustee after the establishment of the trusts except on two occasions on purely clerical matters.

In summary, we find that petitioner never had direct or indirect control over the proceeds of the sale of the Arvin stock by the trusts. By creating the three irrevocable trusts to which he donated a total of 2,500 shares (worth over $70,000) and sold 21,500 shares, he vested in the trustee control of all such stock prior to the trustee's sale of the 15,400 shares, as well as control of the proceeds of the shares that were sold. The trustee was not subservient to petitioner. It was independent of petitioner. Indeed, after the trusts were created, petitioner had virtually no contact with the trustee. Nor did petitioner possess the economic benefit of the proceeds of the Arvin stock sales. He possessed only the rights he acquired under the installment notes.

An installment sale question similar to that presented in the instant case was dealt with in *Nye v. United States*, 407 F. Supp. 1345 (M.D. N.C. 1975), involving a sale between a wife and husband. Mrs Nye, a successful physician, owned a significant amount of appreciated securities of one company. Her husband, an attorney, needed cash to satisfy certain obligations to third parties. Mrs. Nye sold to Mr. Nye a portion of her securities for a cash downpayment and the balance payable over 11 years at 4-percent interest. Shortly thereafter, Mr. Nye resold the securities in the open market and used the proceeds to meet his personal obligations. The court sustained Mrs. Nye's installment reporting of the gain upon the sale to her husband on the ground that the buyer and the seller, although husband and wife, were acting independently, each with his or her own purpose for entering into the transaction. Under such circumstances there was no ground for denial of the use of the installment method. See also *Fincke v. Commissioner*, 39 B.T.A. 510, 514 (1939).[4]

---

[4]In *Fincke v. Commissioner*, 39 B.T.A. 510, 514 (1939), the taxpayer sold stock to trusts for his wife and children at his cost, and the trusts resold the stock on the open market at a higher price. The notice of deficiency treated the transaction in part as a sale and in part as a gift. Rejecting the Commissioner's allegation in his amended answer, similar to the position taken in the instant case,

In the final analysis, respondent's position would require us to effectively restructure the entire transaction. He would have us treat the trusts' sales of the 15,400 shares as a sale by petitioner on the open market, followed by a contribution of the proceeds to the trust.[5] But we fail to see how this reordering of events would reflect the economic or legal realities any more accurately than the transaction as structured by the parties. See *Carrington v. Commissioner*, 476 F.2d 704, 709 (5th Cir. 1973), affg. a Memorandum Opinion of this Court.[6]

From an economic standpoint, the trusts, unlike a mere conduit or straw party, had significant potential benefits and risks from the transaction. They acquired the potential capital appreciation of the 21,500 purchased shares. As discussed above, in 1972, when this transaction was entered into, the immediately preceding 20-year performance of mutual funds indicated that such appreciation would be sufficient to meet the note installments and permit the accumulation of a substantial estate for each of the beneficiaries. Significantly, also, the trusts' risk of loss was not limited to the proceeds of the 15,400 shares sold in 1972. If such proceeds and the future income therefrom ultimately proved insufficient to satisfy in full the installment

---

that the taxpayer in reality sold the shares on the market and made a gift of the proceeds to the trusts, the Board of Tax Appeals said (*supra* at 514):

"The petitioner's testimony shows that he deliberately refrained from selling this stock on the market, realizing a large profit himself and subjecting himself to income tax on that profit. Cf. *Gregory v. Helvering*, 293 U.S. 465, as to propriety of avoiding taxes. It is likewise clear that he sold the stock to the three family trusts and his daughter at cost, having in mind that they in turn could sell the stock at a profit. The sales were complete and proper in all essentials. This was his way of increasing the corpus of the trusts and of increasing the property of his minor daughter. The income tax consequences of those acts depend upon what was actually done, not upon what might have been done. It was done in such a way that the petitioner realized no profit whatsoever."

[5]Although the open-market sales of the 15,400 shares by the trusts were at an average price per share lower than petitioner's selling price to the trusts, respondent has computed petitioner's gain based upon the latter. While this would obviously be the correct measure of petitioner's gain (spread out on the installment method) if the sale to the trusts is recognized in accordance with the form of the transaction, it would seem that if the trusts are viewed as mere controlled conduits for an open-market sale for the benefit of petitioner, petitioner's taxable gain should be based upon the lower ultimate open-market selling price; the stated selling price to the "conduits" being irrelevant. In this respect there is a gap in respondent's underlying theory.

[6]Respondent relies upon Rev. Rul. 73-157, 1973-1 C.B. 213, dealing with two situations in which a seller first negotiates a cash sale with a purchaser and then utilizes a controlled intermediary (in one case the seller's son; in the other his controlled corporation) through which the sale is effected in two stages, solely for the purpose of utilizing the installment reporting method. The ruling is not applicable in the instant case since in the ruling the transfers to the intermediaries were made only after a cash sale had been negotiated and prearranged with the ultimate purchaser. Such was not the case here; the trustee had no obligation to either the original seller or any ultimate purchaser with respect to disposition of the Arvin shares.

notes to petitioner, the other assets of the three trusts, including the other 6,100 purchased shares, as well as the 2,500 contributed shares, were at risk. Thus, the transaction as structured by the parties had economic reality.[7]

No doubt petitioner expected the trustee to sell the Arvin stock and invest the proceeds in mutual fund shares, and no doubt officials of the bank, as trustee, planned to do so. But the three trusts were created and they received the gift of 2,500 shares and bought the 21,500 shares of Arvin stock free of any precommitment for resale to any third party and before any portion of that stock was sold on the open market. Upon acquiring that stock, the trustee became subject to Florida law which imposes a duty of exclusive allegiance to the trust beneficiaries. *Investors Syndicate v. City of Indian Rocks Beach, Florida,* 434 F.2d 871, 878–879 (5th Cir. 1970); *Saunders v. Richard,* 35 Fla. 28, 16 So. 679 (1895); *In Re Will of Wickman,* 289 So.2d 788 (Fla. App. 1974). See also *Skemp v. Commissioner,* 168 F.2d 598 (7th Cir. 1948), revg. 8 T.C. 415 (1947). The legal responsibility for making the decision to sell the Arvin stock was that of the trustee, not petitioner. In these circumstances the prior informal understanding between petitioner and the intended trustee is not decisive. See *Brown v. Commissioner,* 180 F.2d 926, 929 (3d Cir. 1950), revg. 12 T.C. 1095 (1949), cert. denied 340 U.S. 814 (1950); *Oakes v. Commissioner,* 44 T.C. 524, 529 (1965); *Felix v. Commissioner,* 21 T.C. 794, 804 (1954).

In this important respect the situation in the instant case differs from those which pertained in cases such as *Commissioner v. Court Holding Co.,* 324 U.S. 331 (1945), and *Malkan v. Commissioner,* 54 T.C. 1305 (1970). In those cases, intermediate entities were held to be mere conduits. The critical element was the original transferor's prearrangement and effective precommitment to a third party for the ultimate retransfer by the intermediate party. But those are not the facts in this case. See and compare *United States v. Cumberland Pub. Serv. Co.,* 338 U.S. 451 (1950); *Sheppard v. United States,* 361 F.2d 972 (Ct. Cl.

---

[7] It is inconceivable that petitioner, in his straitened financial circumstances, purposely would have sold 15,400 shares of his Arvin stock, contributed all the sales proceeds thereof to an irrevocable trust, and thereby incurred an immediate tax on capital gain of $222,905 without making any provision to pay the tax. "The fact that favorable tax consequences were taken into account * * * on entering into the transaction is no reason for disallowing those consequences." *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978).

1966); *Rushing v. Commissioner*, 441 F.2d 593 (5th Cir. 1971), affg. 52 T.C. 888 (1969).

Other cases relied upon by respondent are also inapposite. In *Griffiths v. Commissioner*, 308 U.S. 355 (1939), the Supreme Court denied installment sale benefits to a seller who arranged for an intermediate corporation which he wholly controlled to collect the sales price from the buyer and pay it over to him in installments. In contrast, the Pityo trusts were controlled by the trustee, not petitioner. In *Williams v. United States*, 219 F.2d 523, 527 (5th Cir. 1955), the taxpayer accepted a bid for the purchase of timber but declined to accept payment even though the purchaser desired and offered to pay the full purchase price; instead, the taxpayer arranged for the purchase price to be deposited with a bank in escrow for disbursement to the taxpayer in four annual installments. The installment reporting method was held inapplicable because the seller was considered to have constructively received the proceeds upon acceptance of the bid. In the instant case, at no point could petitioner have obtained possession of the sales proceeds in dispute.

Also distinguishable is *Wrenn v. Commissioner*, 67 T.C. 576 (1976). In that case, the taxpayer-husband purportedly made a sale of securities to his wife for a 15-year installment note. The wife immediately resold the securities and reinvested the proceeds in mutual funds which were used as collateral for her installment obligation to her husband. Distinguishing *Nye v. United States*, 407 F. Supp. 1345 (M.D. N.C. 1975), this Court held that the transaction was not a bona fide installment sale since the taxpayer did not establish any bona fide reason for his wife's participation in the transaction. In contrast, in the instant case, the trustee was an independent party with other property at risk, acting for the benefit of the designated beneficiaries and expecting to derive a benefit for them from the transaction through the potential increase in the value of the trusts' corpora (the mutual fund shares) in excess of the total amounts needed to pay the notes to petitioner. The trusts were irrevocable and had a substantial independent interest in entering the transaction: the opportunity to profit from the investment of funds obtained at a relatively low interest rate and repayable over a long period of years.

Upon careful consideration of all the evidence, we conclude that petitioner in 1972 made a bona fide sale of his 21,500 shares

of Arvin stock to independent trusts and is entitled to report his gain from the sale under the installment method of accounting. To reflect the disposition of other issues,

*Decision will be entered under Rule 155.*